308 Ga. 613
FINAL COPY

S20A0217.  DAWSON v. THE STATE.

WARREN, Justice.

A jury convicted Lavaris Dawson of felony murder and other crimes in connection with the shooting death of Mamadou Camara.[1] On appeal, Dawson contends that the evidence was insufficient to support his convictions, that the trial court erred by admitting Dawson's statements to a detective during an interview because those statements were impermissibly induced by a hope of benefit,

[1] The crimes occurred in the early morning hours of February 20, 2007. A Fulton County grand jury indicted Dawson on September 21, 2007, charging him with malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  At a trial held from February 1 to 8, 2010, the jury found Dawson not guilty of malice murder but guilty of all remaining counts.  The trial court sentenced Dawson to life in prison for the felony murder count and a consecutive term of five years of probation for the firearm count. It then merged the aggravated assault count for purposes of sentencing.  Dawson filed a timely motion for new trial on February 11, 2010, which he amended multiple times, most recently through current counsel on November 19, 2018. After a hearing, the trial court denied the motion, as amended, on February 20, 2019.  On March 22, 2019, Dawson filed a timely notice of appeal, but the case was returned to the superior court to add certain exhibits to the record.  Once that issue was resolved, Dawson filed an amended notice of appeal on August 30, 2019, and the case was docketed in this Court to the term beginning in December 2019 and submitted for a decision on the briefs.

and that Dawson was denied his due process right to a timely appeal. We disagree and affirm Dawson's convictions.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Dawson's trial showed the following. On the night of February 19, 2007, Camara attempted to purchase stolen electronics from Kevin Pope, who lived at the Highland Brook Apartment Complex. After arriving at the apartment complex and giving money to Pope, who walked away to retrieve the electronics while Camara remained in the car, Camara was shot and killed in an attempted carjacking. Because investigators initially were unable to uncover enough information to make an arrest, Camara's murder went unsolved for several months.

In June 2007, however, Detective Mark McGowan, the lead detective on the case, was notified that an inmate, Richard Burkes, wanted to share information about Camara's murder. Burkes informed Detective McGowan that Burkes witnessed the murder. Burkes described the shooter as "a black male, not very tall, with a dark complexion with gold in his mouth, and some dread locks" — a

description matching Dawson. Law enforcement was already aware of Dawson from earlier investigation of the case, so Detective McGowan presented a photographic lineup to Burkes that contained Dawson's picture.  Burkes told Detective McGowan that Burkes was not sure if the shooter was pictured and circled a man who was not Dawson, saying that the man looked like the shooter.  But Burkes also told Detective McGowan that another person in the lineup — who was, in fact, Dawson—could have been the shooter.  Burkes informed Detective McGowan that Pope was present at the scene of the crime, and Burkes identified Pope in a photographic lineup.

Police arrested Pope, who had previously denied knowing anything about the murder, for making false statements.  After Pope was arrested, he independently mentioned Dawson to Detective McGowan and identified Dawson from a photograph.  According to Detective McGowan's trial testimony, Pope "identified Lavaris Dawson as the shooter in the case" and told Detective McGowan that Dawson told Pope that "[Camara] had taken something from [Dawson] and that he did what he had to do."

Police arrested Dawson for Camara's murder.  After being advised of the *Miranda* warnings,[2] Dawson consented to a custodial interview with Detective McGowan, in which Dawson admitted that he was at the scene with a handgun on the night Camara was killed. According to Dawson, he and another person had guns and "were just shooting."  Dawson told Detective McGowan:

> I was shooting in the air at first, but then I pointed at — but I was still shooting in the air — but I guess aiming towards [Camara's] way . . . and then he was driving off and I heard the window break . . . I don't know if I did it or not . . . I was shooting over the car — well, I thought I was, but if I wasn't, then hit that window . . . then it spun out of control and he crashed.

That recorded interview was played for the jury at Dawson's trial.

Burkes also testified at Dawson's trial. According to Burkes's trial testimony, he was sitting in his parked car in the parking lot of the apartment complex about 30 feet away from where Camara was parked.  Burkes saw Pope approach Camara's car, Camara give some money to Pope, and then Pope walk around to the other side of

---

[2] *Miranda v. Arizona,* 384 U.S. 436, 479 (86 SCt 1602, 16 LE2d 694) (1966).

the apartment building. Burkes testified that while Pope was away, a young man — whom Burkes did not know and who was about 5′5″ tall with "gold fronts [and] dreads" — approached Camara's car with a gun and attempted to carjack Camara, telling him, "I want the car, get out the car." When Camara refused, the gunman shot at Camara, and as Camara attempted to speed off, the gunman shot at him again through the back, right window.[3] Camara's car then crashed into a parked van. Burkes testified that the shooter "just went up the steps [to an apartment], changed his clothes, [and] came back down." Burkes identified Dawson in court as a person he had previously identified in the photographic lineup who he thought could be the shooter.

Pope also testified at trial and identified Dawson in court as the only person he saw with a gun on the night of the murder. Pope said he spoke with Dawson days after the murder, and Dawson told Pope, "I shot" because "[Camara] wouldn't give it up." Another

---

[3] Burkes's description of the shooter matched Dawson, and his description of the shooting matched the physical evidence found at the scene.

witness who lived in the apartment complex testified at trial that after she heard gunshots, she saw three men running, one of whom she identified as Pope, and another of whom she described as "short with dreads, kind of brown-skinned." She also testified that Pope and the man with dreads had changed into different clothes by the time the police arrived.

2. Dawson argues that without certain hearsay testimony and custodial statements that he says were inadmissible and improperly admitted, the evidence was insufficient to prove that he committed the crimes for which he was convicted. We disagree.

Specifically, Dawson argues that Pope's testimony that Dawson told him, "I shot" because Camara "wouldn't give it up"; Burke's testimony that he heard the shooter tell Camara, "I want the car, get out the car"; and Detective McGowan's testimony that Pope told him that Dawson said he "did what he had to do" because Camara took something from Dawson were inadmissible hearsay. And because generally speaking, under Georgia's old Evidence

Code,[4] "erroneously-admitted hearsay" was deemed to have no probative value and therefore could not be considered in determining the sufficiency of the evidence, *Livingston v. State*, 268 Ga. 205, 209 (486 SE2d 845) (1997); see also *Cowart v. State*, 294 Ga. 333, 343 n.12 (751 SE2d 399) (2013), Dawson argues that these three statements cannot be considered in our sufficiency review and that the remaining evidence was insufficient to support his convictions. The applicability of this old Evidence Code exception to our sufficiency review, however, does not change the outcome in Dawson's case, because the first two statements he complains of were admissible at trial, and — even assuming that the third statement was inadmissible — the evidence was still sufficient to support his convictions.

As for the first statement — Pope's testimony that Dawson told him, "I shot" because Camara "wouldn't give it up" — Dawson's argument fails to recognize that under our old Evidence Code,

_____

[4] Because Dawson was tried in 2010, the old Evidence Code applies to his case.

"[a]dmissions of a party opponent are admissible as exceptions to the hearsay rule." *Bostic v. State*, 294 Ga. 845, 848 (757 SE2d 59) (2014); see also, e.g., *Lewis v. State*, 293 Ga. 110, 114 (744 SE2d 21) (2013) (witness's testimony that defendant told him that defendant and co-defendant discussed killing victim was admissible because "[a]ny statement or conduct of a person, indicating a consciousness of guilt, where such person is, at the time or thereafter, charged with or suspected of crime, is admissible against him upon his trial for committing it") (citation and punctuation omitted); *Russell v. State*, 265 Ga. 203, 204 (455 SE2d 34) (1995), overruled on other grounds by *Terry v. State*, 291 Ga. 508 (731 SE2d 669) (2012) (trial court did not err by allowing State to present testimony that after victim's death, the defendant "threatened someone by saying she had killed one person and would not mind killing another person" because the statement was deemed an admission).[5] Dawson's statement, as communicated through Pope's testimony at trial, was not

[5] Our current Evidence Code defines "[a]dmissions by party-opponent" and provides that "[a]dmissions shall not be excluded by the hearsay rule." See OCGA § 24-8-801 (d) (2).

inadmissible hearsay because the State elicited it as an admission of a party opponent, which is admissible as an exception to the hearsay rule.

Likewise, the second statement — Burke's testimony that he heard the shooter tell Camara, "I want the car, get out the car" — was also admissible. That is because under our old Evidence Code's res gestae exception, "[d]eclarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae." Former OCGA § 24-3-3. Because Burke's testimony about hearing the shooter demand that Camara get out of the car immediately before shooting Camara was a "declaration[ ] accompanying an act," it was admissible as part of the res gestae. See, e.g., *Tesfaye v. State*, 275 Ga. 439, 443 (569 SE2d 849) (2002) (witness's testimony that he heard one perpetrator in a robbery and murder say to another, "Oh, s—t, why did you do that, man?" was admissible as res gestae because perpetrator's statement was "uttered contemporaneously with [the] pertinent acts, and serve[d]

to account for, qualify, or explain them, and [were] apparently natural and spontaneous") (citation and punctuation omitted); *Durham v. State*, 243 Ga. 408, 410 (254 SE2d 359) (1979) (witness's testimony that defendant told him something "to the effect [of] this wasn't the first time he had killed anybody" was admissible as res gestae because defendant's statement was made "before and during the commission of the rape and murder").

Finally, even if the trial court erred by admitting the third statement — Detective McGowan's testimony that Pope told him that Dawson said he "did what he had to do" because Camara took something from Dawson[6] — the other evidence presented at trial was sufficient to sustain Dawson's convictions. Indeed, we have already concluded that Pope's testimony about Dawson's admission that Dawson shot Camara was admissible. Moreover, despite

_____

[6] Although Dawson's declaration to Pope that Dawson "did what he had to do" would be admissible as an admission of a party opponent, see *Bostic*, 294 Ga. at 848, that declaration came into evidence through Detective McGowan, not Pope. See *Myers v. State*, 275 Ga. 709, 712 (572 SE2d 606) (2002) (hearsay testimony "is not admissible unless it meets an exception to the rule against the admission of hearsay").

Dawson's contention that his custodial statements to Detective McGowan — wherein Dawson admitted that he was at the scene with a gun at the time of Camara's murder and that he shot toward Camara's car — were improperly admitted at trial, under *Jackson v. Virginia*, generally "*all of the evidence* is to be considered in the light most favorable to the prosecution," and the old Evidence Code exception precluding consideration of inadmissible hearsay does not apply to these statements. 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original); see also *Cowart*, 294 Ga. at 343 (citing *Jackson*, 443 U.S. at 318). Here, in addition to Dawson's admissions mentioned above, the other evidence presented at trial included Pope's identification of Dawson as the shooter after identifying Dawson from a photograph; Burke's specific description of the shooter, which matched Dawson; Burke's identification of Dawson as a potential shooter; and the apartment complex resident's description of a man matching Dawson's description running after she heard gunshots. Viewed in the light most favorable to the verdicts, this evidence was sufficient to authorize a

rational jury to find Dawson guilty beyond a reasonable doubt of the crimes for which he was convicted.  See *Jackson*, 443 U.S. at 319.

3.    Dawson argues that his confession to Detective McGowan was induced by the "slightest hope of benefit" of a shorter sentence or lesser charges, see former OCGA § 24-3-50, and that the trial court therefore erred in denying his motion to suppress that confession.  We disagree.

"To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."  Former OCGA § 24-3-50.[7] "[T]his Court has consistently interpreted the phrase 'slightest hope of benefit' not in the colloquial sense, but as it is understood in the context within the statute," and therefore "[i]t has long been understood that 'slightest hope of benefit' refers to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Budhani v. State*, 306 Ga. 315, 325

---

[7] Former OCGA § 24-3-50 was carried forward nearly verbatim in the current Evidence Code.  See OCGA § 24-8-824.

(830 SE2d 195) (2019) (citations and punctuation omitted); see also *Brown v. State*, 290 Ga. 865, 868-869 (725 SE2d 320) (2012) (applying same statutory inquiry for claims of hope of benefit under the old Evidence Code). But this Court has also explained that certain other law enforcement tactics — "such as exhortations or encouragement to tell the truth, conveying the seriousness of the accused's situation, or offering to inform the district attorney about the accused's cooperation" — do not constitute a hope of benefit, so long as it is made "clear that only the district attorney can determine charges and plea deals." *Budhani*, 306 Ga. at 325 (collecting cases); see also former OCGA § 24-3-51 ("The fact that a confession has been made under a spiritual exhortation, a promise of secrecy, or a promise of collateral benefit shall not exclude it.").[8]

When we review a trial court's denial of a motion to suppress a statement, "we owe no deference to the way in which the trial court resolved questions of law, but we generally accept its findings about

---

[8] Former OCGA § 24-3-51 was carried forward verbatim in the current Evidence Code. See OCGA § 24-8-825.

questions of fact and credibility unless clearly erroneous." *Edenfield v. State*, 293 Ga. 370, 374 (744 SE2d 738) (2013), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 n.3 (820 SE2d 640) (2018). However, where, as here, a video recording of the custodial interview is part of the appellate record, "the reviewing court may also consider facts that definitely can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from audio- or video- recordings." *State v. Rumph*, 307 Ga. 477, 478 (837 SE2d 358) (2019) (citation and punctuation omitted).

Dawson contends that several statements Detective McGowan made to him during his custodial interview impermissibly communicated that Dawson would receive lesser charges or a shorter sentence — i.e., offered a hope of benefit — if Dawson incriminated himself. Among other similar statements, Dawson complains about the following statements Detective McGowan made before Dawson ultimately admitted to Detective McGowan that Dawson was at the scene of Camara's murder with a handgun, and

that he shot toward Camara's car:

- "The punishment for murder in this state is anywhere from life in prison to death."

- "Maybe this wasn't a murder. Maybe this was an accident. Maybe that can be explained to the district attorney's office when it's time for them to think about what charges to pursue in this case because so far we only have certain sides of the story; we don't have the other side of the story, the man who pulled the trigger."

- "If I turn in a report to the DA's office that says, 'I questioned Lavaris and he says he don't know nothing about nothing,' then they're . . . probably gonna pursue the murder."

- "I can't make any kind of promise about what is gonna happen to you. All I can tell you is from my experience and what I've seen, is that when you man up and step forward and handle business, when it comes to being charged with something that you've done, they're usually willing to work with you, even if it's an accident."

- "Maybe there's a different explanation for this. Maybe the right charge isn't murder. Maybe the right charge is one of those charges that goes with this being an accident, that people do a little jail time on, and get out. I don't know. But until you straighten it out for me, you're on the hook for murder."

At the outset, we note that Detective McGowan's accurate

statement informing Dawson that the prison sentence for murder could be life in prison or death is permissible. *Mangrum v. State*, 285 Ga. 676, 678 (681 SE2d 130) (2009) ("[A] statement by police that makes the defendant aware of potential legal consequences is in the nature of a mere truism that does not constitute a promise of benefit within the meaning of this Code section.") (citation and punctuation omitted). Moreover, we previously have considered statements like those Detective McGowan made urging Dawson to explain his side of the story — for example, suggesting that Camara's death may not have been intentional, and was instead a mistake or an accident — and concluded that such statements are permissible. See, e.g., *Pittman v. State*, 277 Ga. 475, 477 (592 SE2d 72) (2004) ("The detective's suggestion that [the accused] may not have intended to kill the victim did not amount to a hope of benefit."); *Tyler v. State*, 247 Ga. 119, 122 (274 SE2d 549) (1981) (agent's statement, "I told [the accused] that the best thing, if she had anything to do with it, was to go ahead and get it off her chest; that sometimes people did things for various reasons; sometimes it's

self-defense — just various reasons," was not an impermissible hope of lighter punishment because "[f]or an officer to advise an accused that it is always best to tell the truth will not, without more, render a subsequent confession inadmissible under [former OCGA § 24-3-50's predecessor statute]") (citation and punctuation omitted).

Indeed, many of Detective McGowan's statements are similar to those a detective made in *Johnson v. State*, 295 Ga. 421 (761 SE2d 13) (2014), warning the accused not to lie because the detective knew the accused was at the crime scene; that the detective wanted to hear the accused's side of the story and version of events; and that he could "get up and walk out this door and send your a** to the county jail and change this charge from aggravated assault to a f***ing murder charge." Id. at 424 (punctuation omitted). In *Johnson*, we held that those statements did not constitute an implied promise of lighter charges or punishment because they "merely suggested that [the accused] would be well served by offering his version of events as a means of justifying or mitigating his role in the assaults" and included a "true statement that

emphasized the gravity of the situation" and "exhortations to tell the truth."  Id. at 424-425.

Likewise, the record here shows that "[d]uring the course of the interview," Detective McGowan "implored" Dawson "to tell the truth and to help himself, which was not improper."  *Price v. State*, 305 Ga. 608, 611 (825 SE2d 178) (2019).  And Detective McGowan never "promised" Dawson "that he would not be charged with a crime or that he would receive reduced charges, sentencing or punishment if he made incriminating statements."  Id. (citation and punctuation omitted); see also *Shepard v. State*, 300 Ga. 167, 169 (794 SE2d 121) (2016) ("The detectives never told [the accused] that he would not be charged with murder, that he would be charged with a lesser crime, or that he would, in fact, receive a shorter sentence if he gave a statement.").  Moreover, the record shows that throughout the interview, as Detective McGowan exhorted Dawson to tell the truth, he also made clear that he could not make "any kind of promise about what [was] gonna happen to [Dawson]," and that it was not Detective McGowan, but others like the district attorney and the

judge, who would ultimately decide matters concerning Dawson's charges and sentencing. See *Pittman*, 277 Ga. at 478 (the "detective "plainly told [the accused] that he could not promise him anything other than that he would relate [the accused's] version of events"); *Tyler*, 247 Ga. at 122 (agent's statement that "whatever [the accused] told me I'd be willing to present it to the court," was not an impermissible inducement or hope of lighter punishment) (punctuation omitted). Indeed, it is permissible for a detective to tell the accused that the detective will inform the district attorney or trial court about the accused's truthfulness and cooperation, so long as the detective does not promise a hope of benefit. See, e.g., *Price*, 305 Ga. at 611 ("[I]t is permissible 'for the police to tell a suspect that the trial judge may consider (his) truthful cooperation with the police.'") (citation omitted); *Preston v. State*, 282 Ga. 210, 212 (647 SE2d 260) (2007) (investigator's statement that the district attorney based his or her charging decisions on the police's recommendation and the investigator's request to let him help were permissible admonitions to tell the truth, not implicit promises of hope of

benefit). Cf. *Budhani*, 306 Ga. at 317, 328 (investigator's statements that if accused admitted to how long he had been selling drugs, "I'm not going back and charging you. . . . You're not going to get any more charges," and similar assurances, constituted an impermissible hope of benefit) (punctuation omitted); *Canty v. State*, 286 Ga. 608, 610 (690 SE2d 609) (2010) (where a detective "told [the accused] much more than simply that his cooperation would be made known to the prosecution," and also told him "that confessing to the crime could result in a 'shorter term,'" the detective's statements constituted an impermissible hope of benefit).

Finally, any other statements Detective McGowan made to the effect that Dawson might be able to help himself avoid murder charges and the lengthier sentences associated with them did not rise to the level of promises of lesser charges or a shorter sentence, and therefore did not rise to the level of an impermissible hope of benefit, because they were permissible exhortations to tell the truth. See *Johnson*, 295 Ga. at 424; *Pittman*, 277 Ga. at 478.

Dawson relies heavily on *State v. Ray*, 272 Ga. 450 (531 SE2d

705) (2000), to argue that Detective McGowan's statements constituted a deliberate and impermissible attempt to get Dawson to confess by implying that a confession would result in a lighter sentence. But in *Ray*, a detective interrogated a suspect who had not been given the *Miranda* warnings; suggested that as an accomplice who testified, the suspect would have the possibility of avoiding the death penalty; suggested that the suspect could "save himself from execution by telling the officers truthfully about the crimes"; and in direct response to the suspect's question, "what would I get if I give the other guy up?" an officer replied, "Possibly — here's what I can tell you. Years of freedom." Id. at 451-452 (punctuation omitted). There, under the totality of circumstances, we affirmed the trial court's ruling that "the officers induced [the suspect] into confessing by holding out a hope of benefit in the form of a lesser punishment." Id. at 452.[9]

---

[9] Dawson also points to *State v. Ritter*, 268 Ga. 108 (485 SE2d 492) (1997), but that case, which turned on misrepresentations made by the interrogating officer, is also distinguishable. Moreover, this Court recently expressed "serious doubts as to whether *Ritter* was rightly decided." *Mann v. State*, 307 Ga. 696, 702 n.4 (838 SE2d 305) (2020).

Here, by contrast, when Dawson asked Detective McGowan, "how long am I gonna go [to prison]?" Detective McGowan replied, "I don't know; I can't decide for you where you go or how long you go there for. All I can do for you is take this information, take your version of the story to the folks I turn this file into . . . ." Given this and other dissimilarities, *Ray* does not control here. Accordingly, we conclude that the trial court did not err in denying Dawson's motion to suppress the statements he made to Detective McGowan.

4. Dawson contends that his due process right to a timely appeal was violated, requiring reversal of his convictions. Specifically, he contends that because his motion for new trial was not decided until over nine years after he was convicted, and because evidence at his motion for new trial hearing showed that he sent multiple letters and motions to the trial court during that delay but that his case "majorly fell through the cracks," we must presume that he was prejudiced by the delay.

"In assessing a due process claim premised on a post-conviction delay, we generally look at four factors: the length of the delay, the

reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Norman v. State*, 303 Ga. 635, 642 (814 SE2d 401) (2018) (citations and punctuation omitted).[10]   In the appellate delay context, "prejudice, unlike in the speedy trial context, is not presumed but must be shown." *Veal v. State*, 301 Ga. 161, 168 (800 SE2d 325) (2017) (citation and punctuation omitted). Importantly, "we have repeatedly found that the failure to make this showing [of prejudice] in an appellate delay claim to be fatal to the claim, even when the other three factors weigh in the appellant's favor." Id. (citing cases).

> The prejudice necessary to establish a due process violation based on post-conviction direct appeal delay is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's defenses in the event of retrial or resentencing.

*Loadholt v. State*, 286 Ga. 402, 406 (687 SE2d 824) (2010) (punctuation omitted) (quoting *Chatman v. Mancill*, 280 Ga. 253,

---

[10] These same four factors are commonly referenced as the "*Barker-Wingo* factors." See *Barker v. Wingo*, 407 U.S. 514 (92 SCt 2182, 33 LE2d 101) (1972).

260 (626 SE2d 102) (2006)).

Dawson's claim here fails because he mistakenly relies on inapposite speedy-trial cases to argue that prejudice is presumed in the context of post-conviction appellate delay. In so doing, Dawson fails to show the prejudice necessary to support his claim. *Loadholt*, 286 Ga. at 406 (bare assertions of prejudice based on the passage of time "fail[ ] to offer the specific evidence required to show that the delay has prejudiced [a defendant's] appeal"). Therefore, even assuming without deciding that the other three *Barker-Wingo* factors each weigh in Dawson's favor, his failure to make the requisite showing of prejudice is fatal to his claim of appellate delay.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 4, 2020.
Murder. Fulton Superior Court. Before Judge Cox.
*Jessica A. Seares*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.