314 Ga. 838
FINAL COPY

S22A0659.  TORRES v. THE STATE.

BETHEL, Justice.

Luis Jose Torres was found guilty of the felony murder of Dennis Bryant and other offenses at a bench trial held before the Appling County Superior Court. Torres appeals, arguing that the evidence presented at trial was insufficient as a matter of Georgia law to sustain his convictions, that the trial court erred by denying his motion to suppress statements he made to the police, and that double jeopardy barred his re-trial after he had previously been acquitted by a jury of some offenses arising from the events surrounding Bryant's death.[1] We affirm.

---

[1] The crimes occurred on December 30, 2018. On March 19, 2019, an Appling County grand jury indicted Torres, Gabrielle Labaco, Daisy Lott, Rhett Wheeler, Rocky Wheeler, and Catherine Zipperer for 16 counts stemming from the incident. Torres was charged with six counts of felony murder (Counts 1-6), criminal attempt to commit armed robbery (Count 7), conspiracy to commit armed robbery (Count 8), armed robbery (Count 9), conspiracy to commit aggravated assault (Count 10), aggravated assault with intent to rob (Count 11), aggravated assault with a deadly weapon (Count 12), theft by taking (Count 13), and tampering with evidence (Count 14). Labaco,

1. (a) Viewed in the light most favorable to the verdicts,[2] the evidence presented at Torres's bench trial showed the following. On the evening of December 30, 2018, Torres and his girlfriend,

Rhett, Rocky, and Zipperer were indicted jointly with Torres on Counts 1-4, 7-10, and 13. Rhett and Rocky were jointly indicted with Torres on Counts 5, 6, 11, and 12. All six co-defendants were indicted on Count 14. Lott, Rhett, Rocky, and Zipperer were also indicted with tampering with evidence (Count 15). Lott was also indicted with hindering apprehension or punishment of a criminal (Count 16).

At a jury trial held in July 2019, Torres was found guilty of Counts 4, 5, 10, 11, and 14 and found not guilty of the remaining counts against him. Torres filed a motion for new trial in August 2019, which the trial court granted in June 2020. Before his retrial, Rocky and Rhett entered guilty pleas. On September 1, 2021, the State filed a motion to sever Torres's case from those of the remaining co-defendants, which the trial court granted that day. Torres later requested that his second trial be a bench trial, which the court granted on September 9, 2021. None of the other co-defendants' cases are part of this appeal.

Before the start of his bench trial, Torres orally raised a plea in bar based on double jeopardy as to Counts 1-3, 6-9, 12, and 13, of which he was found not guilty in his first trial. At Torres's bench trial, held on September 23, 2021, the trial court orally granted Torres's plea in bar and later found him guilty of Counts 4, 5, 10, 11, and 14. On October 21, 2021, the trial court entered an order granting Torres's plea in bar nunc pro tunc to September 23, 2021. On December 6, 2021, the trial court sentenced Torres to life in prison on Count 4 and a concurrent sentence of ten years in prison on Count 14. The remaining counts were vacated by operation of law or merged for sentencing. Torres did not file a motion for new trial. He filed a notice of appeal directed to this Court on January 3, 2022. His case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

[2] See *Jones v. State*, 307 Ga. 505, 506 (1) (837 SE2d 288) (2019) ("Similar to appeals from a jury trial resulting in a criminal conviction, on appeal from a bench trial," when evaluating the sufficiency of the evidence presented at trial, "we view all evidence in the light most favorable to the trial court's verdict . . . . We do not re-weigh testimony, determine witness credibility, or address assertions of conflicting evidence." (citation and punctuation omitted)).

Gabrielle Labaco, were invited to a party by Rocky Wheeler. Torres and Labaco agreed to go, and Rocky drove them to the party.

At the party, multiple people were playing beer pong. During the course of the game, Rocky lost $500 to Dennis Bryant and was angry about losing the money. Bryant later left the party.

Shortly after, Torres asked Rocky to drive him and Labaco home because Torres did not have his own vehicle. With Rocky driving, Torres, Labaco, Rocky, Rhett Wheeler, Catherine Zipperer, and Daisy Lott all left the party together. As they were driving, they passed a Huddle House and saw Bryant inside.

They then agreed that they would follow Bryant and that Rocky and Rhett would take his money and beat him up. As part of that plan, Torres agreed to be a lookout.

A few minutes later, Bryant left Huddle House and went to the Key West Inn in Appling County. Zipperer drove Rocky's car, and the group followed Bryant to the Key West Inn. Video recordings taken from nearby surveillance cameras show that Zipperer pulled into the parking lot with the headlights off and parked in the middle

3

of the parking lot. Over roughly the next ten minutes, while Bryant was in the lobby of the hotel, Torres, Rocky, and Rhett moved around the parking lot, and Zipperer pulled the car to the end of the parking lot. During that time, Torres covered his face by wrapping a piece of clothing around his head.

After checking in and walking back to his car, Bryant brought his car to the back of the hotel, got out of the car, and got an item from the trunk. Torres and the others followed Bryant in Rocky's car to the back of the hotel. Torres, Rocky, and Rhett got out of the car and followed Bryant on foot. Labaco then got out of the car with her face covered, and Zipperer moved the car closer to where Bryant was standing beside his car.

Rocky and Rhett attacked Bryant and began hitting and kicking him. During the attack, Torres saw Bryant reach for a rifle from the trunk of his car. Torres then approached the fight and tried to grab the rifle out of Bryant's hands. During the struggle, the gun fired multiple times, and three bullets hit Torres. Rocky then stabbed Bryant in the neck three times.

4

Torres and the others ran back to Rocky's vehicle, got in, and drove away from the Key West Inn. One of the Wheeler brothers brought Bryant's rifle to Rocky's car and later disposed of it.

After Torres and the others left, the police were called to the scene. By the time the officers arrived, Bryant was dead. Although it initially appeared to some of the officers that Bryant had been shot, the medical examiner later determined that Bryant died of multiple stab wounds.

Torres asked the Wheelers to drop him off at a hospital, and they refused. The Wheelers later made Torres and Labaco get out of the car, and the Wheelers and the rest of the group drove away.

Torres and Labaco were later seen on the side of the road by Appling County Sheriff Mark Melton and two deputies. An ambulance arrived on the scene about five minutes after Sheriff Melton and his deputies arrived, and Torres was transported to the hospital. Before Torres was taken to the hospital, Sheriff Melton spoke to both Torres and Labaco and asked Torres, "Do you know what happened, buddy?" Torres told Sheriff Melton that he had been

shot while walking by the Key West Inn.[3]

Later that night, Torres was interviewed by GBI Special Agent Kendra Fitzgerald at the hospital. She gave Torres *Miranda* warnings.[4] Torres orally acknowledged the warnings and agreed to speak with her. In the interview, Torres told Special Agent Fitzgerald that Rocky had lost $500 in a game of beer pong. He said that Rocky and Rhett "wanted to get" Bryant and were going to "beat [Bryant] up" and get Rocky's money back and that he had been asked to be a lookout. Torres also said that he tried to take a rifle from Bryant's hands.[5]

The next day, Torres was again interviewed by Special Agent Fitzgerald and GBI Special Agent Seth Hullander at the sheriff's office. Torres was again given *Miranda* warnings, and he signed a form indicating that he had been informed of his rights and that he

---

[3] Audio and video of this exchange were recorded by body cameras being worn by the deputies. At trial, Sheriff Melton testified that Torres's statement "didn't seem plausible" and that he thought Torres "was being deceitful."

[4] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[5] In addition to Special Agent Fitzgerald's testimony, an audio recording of this interview was admitted at trial.

waived them before speaking with the agents. In that interview, Torres said that Rocky had lost $500 in a beer pong game and was "pissed." Torres said that they later saw Bryant at the Huddle House and that Rocky said that Bryant "[had] his money" and that he "wanted it back." Torres said that he and the others followed Bryant to the Key West Inn. Torres also stated that he had been behind the Key West Inn and later on the side of the road. Torres explained that he told Rocky that he was not going to "touch or hurt" Bryant, but that Rocky told him that Torres was "supposed to be [his] friend so at least be some kind of lookout." Torres told Rocky, "fine." Torres explained that Rocky told him to put on a mask "because . . . there were cameras," which he agreed to do because he was scared.

Torres further explained that, during the altercation with Bryant, he saw that a rifle was pointed at the car where Labaco was waiting and that he went to Bryant and tried to pull the rifle from his hands "so nobody got shot." Torres said that Rocky and Rhett were "whipping [Bryant's] ass," and after the altercation, Rocky got back in the car and told Torres, "I think I killed him." Torres told

7

the police that he knew Rocky had a knife with him, based on a conversation with him earlier that evening before the party.

At trial, Torres testified that he reluctantly agreed to be a lookout when the Wheelers confronted Bryant. He further testified that he tried to stop the confrontation when he saw a gun pointed back toward the car where Labaco was waiting and that he tried to get between Bryant and the Wheelers, push the Wheelers away from Bryant, and grab the gun from Bryant. He testified that when he spoke with the sheriff and was questioned by the GBI agents, he tried to explain that he had stopped the fight but that it was hard to get his "mind right" because he was "still in shock" and had taken pain medication, including morphine and Percocet.

(b) Torres argues that the evidence presented at trial was insufficient under OCGA § 24-14-6, which provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." "However, this doctrine only applies when the State's

8

case against the defendant was wholly circumstantial, and in this case, the State did not rely solely on circumstantial evidence." (Citation and punctuation omitted.) *Hill v. State*, 297 Ga. 675, 678 (2) (b) (777 SE2d 460) (2015).

Here, Torres's statements to law enforcement about his involvement in planning the crimes and how he served as a lookout provided direct evidence that he helped plan and commit the crimes. See *Eggleston v. State*, 309 Ga. 888, 891 (848 SE2d 853) (2020); *Hill*, 297 Ga. at 678 (2) (b). Moreover, the trial court, as the trier of fact, was authorized to reject Torres's self-serving assertion in his trial testimony that, after the attack on Bryant began, he abandoned his role in the robbery and attempted to wrestle a gun away from Bryant in order to protect everyone involved. See *Fitts v. State*, 312 Ga. 134, 143 (3) n.9 (859 SE2d 79) (2021) (noting that, if disbelieved by the trier of fact, the defendant's testimony denying involvement in the crimes could have served as direct evidence of defendant's guilt as a party to the crimes); *Outler v. State*, 305 Ga. 701, 703-704 (1) (a) (827 SE2d 659) (2019) (holding, under OCGA § 24-14-6, that "[t]he [trier

9

of fact] was authorized to reject [the appellant's] hypothesis"). Thus, Torres's claim that the evidence was insufficient under OCGA § 24-14-6 fails.

2. Torres next argues that the trial court erred by admitting into evidence the three statements he made to Sheriff Melton and Special Agents Fitzgerald and Hullander. We disagree.

As noted above, Torres gave three statements to the police: one on the roadside after the incident at the Key West Inn, one the same night at the hospital, and one the following day at the sheriff's office. Torres filed a motion in limine to suppress each of these statements, arguing that each statement was custodial and not given voluntarily. Torres also argued that the second and third statements he gave were induced by a hope of benefit. Following a *Jackson-Denno* hearing,[6] the trial court denied the motion to suppress as to each of Torres's statements.

(a) *First Interview*

Sheriff Melton testified at the hearing that, the night Bryant

---

[6] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

10

was killed, he and his deputies were called to the Key West Inn after gunshots were reported. At the time there were no suspects for the crimes, and it appeared to Sheriff Melton that a shooting had taken place in the parking lot because there were bullet casings scattered around the area where Bryant was lying on the ground and "bleeding profusely." While at the scene, Sheriff Melton received a call that a male and a female, later identified as Torres and Labaco, were sitting on the side of the road a short distance from the Key West Inn and that the male had been shot. At that point, Torres and Labaco were not suspects in the shooting at the Key West Inn.

When Sheriff Melton and his deputy made it to Torres and Labaco, the deputy immediately informed them that an ambulance was on the way. Sheriff Melton then asked Torres and Labaco what happened to them. According to Sheriff Melton, he did not give *Miranda* warnings before speaking with them because he considered them potential victims, had no reason to arrest them, and did not "even know if they were connected to the Key West shooting."

Sheriff Melton testified that, based upon his experience with

interviewing people, he determined that Torres was "cognizant" enough to be interviewed even though it was clear Torres was in pain. Sheriff Melton testified that Torres was able to sit up and answer questions and offered information that was not even asked of him. Sheriff Melton described Torres as being "very vocal" when they spoke and that he did not have to "drag anything" out of Torres.

Two video recordings of the encounter taken from the deputies' body cameras show that an ambulance arrived within five minutes of the sheriff's arrival on the scene where Torres and Labaco were found.[7] Sheriff Melton testified that, at the time the ambulance arrived, he had not yet developed probable cause to arrest Torres, that Torres had never been handcuffed, and that Torres had not been administered any pain medication. Sheriff Melton testified that he never made threats or promises or discussed charges or sentencing with Torres. He reiterated that he did not provide *Miranda* warnings because Torres was "not under arrest."

---

[7] The recordings show that Sheriff Melton and his deputies repeatedly assured Torres that an ambulance had been called and was on the way.

During cross-examination at the hearing, Sheriff Melton testified that, at the beginning of the interview, he had no reason to suspect Torres was involved in the Key West Inn shooting even though "it was a . . . coincidence that we got two shootings almost simultaneously." The questioning continued as follows:

> DEFENSE COUNSEL: So you had some sort of suspicion?
> MELTON: Well, I had two shootings and, you know, I think it's incumbent on me to try to figure out what's what and who, but I don't know — I think you heard in the video that I asked how did they get shot right here. I assumed they got shot right there. I didn't get the information that they had been . . . at the motel until sometime in their conversation.
> DEFENSE COUNSEL: At this point, if either individual had wanted to get up and walk away, would they have been allowed to?
> MELTON: Probably not . . . because we didn't know what we had. . . .
> DEFENSE COUNSEL: But it was not custodial?
> MELTON: That's correct.
> DEFENSE COUNSEL: But they couldn't leave?
> MELTON: I didn't say they couldn't, I said probably not. I don't know. They didn't make an effort to do that.

Torres also testified at the hearing. He said that he did not remember speaking with the sheriff, even after seeing a video of their conversation.

(b) *Second Interview*

Shortly after Torres arrived at the hospital, he was interviewed by Special Agent Fitzgerald, who read *Miranda* warnings to him. Because Torres had been shot in the shoulder, Special Agent Fitzgerald determined it was better to have Torres orally acknowledge and waive his rights rather than sign a form. Torres orally informed Special Agent Fitzgerald that he understood each of his rights and agreed to waive them and speak with her. Special Agent Fitzgerald testified that she determined that, despite his injuries and the pain medication he had been administered,[8] Torres was able to communicate with her. Special Agent Fitzgerald testified that she never threatened Torres, never became violent with him, and never made any promises to him, including in regard to sentencing.[9] Torres was not handcuffed to the bed during the

---

[8] Special Agent Fitzgerald testified that she was informed by a nurse "roughly in the middle of [the] interview" that Torres had been given pain medication, including morphine. She testified that information regarding his medication did not change her opinion as to whether Torres could hear and understand her questions and reply appropriately and that Torres never seemed "out of touch with reality."

[9] In the audio recording of the interview, Special Agent Fitzgerald can also be heard asking a nurse if Torres could have water.

interview. The interview lasted approximately 15 minutes.

Special Agent Fitzgerald also testified that, during the interview, Torres never slurred his words, faded, lost consciousness, or appeared to not understand what was happening. Torres provided answers that Special Agent Fitzgerald later verified to be correct. Torres was also able to provide "long narrative" answers without any prompting and corrected Special Agent Fitzgerald when she needed help understanding his statements.

Near the beginning of the interview, Torres asked Special Agent Fitzgerald whether it would "help [his] case" if he talked to her. Special Agent Fitzgerald responded that she was not an attorney and could not provide legal advice. Near the end of the interview, Torres asked about sentencing:

> TORRES: Am I going to go to jail for life?
> FITZGERALD: Right now, the main thing is to make sure that you're okay. You're going to go to the hospital.[10]

---

[10] After his roadside conversation with Sheriff Melton, Torres was brought to a local hospital for treatment of his gunshot wounds. In the recording of the interview with Special Agent Fitzgerald, a nurse can be heard telling Special Agent Fitzgerald and Torres that Torres was "fine" and "stable" and that he was probably going to be transferred to a hospital in Savannah for surgery.

TORRES: Because I wasn't trying to kill nobody.
FITZGERALD: No, I understand. I understand. The first thing is to get you to the hospital and make sure that all this stuff is okay. . . . That stuff will come later. We'll get it all straightened out.

At the hearing, Special Agent Fitzgerald testified about when Torres mentioned sentencing near the end of the interview:

PROSECUTOR: [I]s he inquiring as far as what his sentencing might be, what his charges might be, that sort of thing?
FITZGERALD: That's what I understood him to say, yes, sir.
PROSECUTOR: He actually said, "Am I looking at going to jail for life, or I'm not going to jail for life or something?" Is that right?
FITZGERALD: Yes, sir.
PROSECUTOR: And you did not answer, did not make any promises, told him, "Right now we're just looking at something else." Is that right?
FITZGERALD: Yes, sir.

Torres testified that he had no recollection of giving the interview in the hospital. He testified that he had been in the hospital because he had been shot and that he could not remember whether he had been told that he received pain medication.

(c) *Third Interview*

The next day, Torres was interviewed a third time at the

16

Appling County Sheriff's Office by GBI Special Agents Hullander and Fitzgerald. The interview, which was recorded, lasted approximately 20 minutes. Torres was again given *Miranda* warnings, and he signed a *Miranda* waiver form. Special Agent Hullander testified at the *Jackson-Denno* hearing that, during the interview, the agents never threatened Torres, physically forced him to talk to them, or made any promises to him. While Torres appeared to have some "discomfort," he did not appear to be in such physical pain that he was unable to understand questions or answer them.

Almost immediately after he signed the waiver-of-rights form, Torres told Special Agent Hullander, "Whatever's going to help me out, I'll let y'all know whatever details y'all want." Special Agent Hullander replied, "I'm glad to hear that. That tells me a lot about the kind of person that you are."

Special Agent Hullander testified as follows in regard to questions Torres asked him:

> PROSECUTOR: And did you make a promise responding to that?
> HULLANDER: No, sir.

PROSECUTOR: What did you tell him?

HULLANDER: I told him I appreciated that and that tells me a lot about the kind of person he is.

PROSECUTOR: But not like, oh good, that'll shave time off?

HULLANDER: No, sir.

PROSECUTOR: I won't arrest you?

HULLANDER: No, sir.

PROSECUTOR: Charge with — discharge you voluntarily?

HULLANDER: No, sir.

In the interview, Torres volunteered to Special Agent Hullander that Rocky stabbed Bryant. Torres then told Special Agent Hullander that he did not want to answer questions but preferred to "lay the whole thing out" for him. Torres then proceeded to detail the events of the evening "quickly, clearly, and concisely," according to Special Agent Hullander. Without being asked, Torres volunteered that he was the lookout for the robbery. He also correctly identified Bryant's rifle as an AR-15 without being provided any information about the type of gun involved in the shooting. Special Agent Hullander testified that, throughout this narrative, Torres never sounded like someone who was having trouble recalling information or communicating.

(d) *The Trial Court's Rulings*

The trial court orally ruled that evidence of Torres's statements from the interview with Sheriff Melton were admissible. Specifically, the court determined that Torres was not in custody when he spoke with Sheriff Melton; that, despite having been shot, Torres was coherent and able to answer questions at the time; and that the pain from the gunshots did not prevent Torres from making his statements to the sheriff freely and voluntarily.

As to the second and third interviews, the trial court determined that Torres had been given *Miranda* warnings before both interviews and that he subsequently acknowledged and waived his rights and proceeded to speak with the agents. Although Torres was in pain and taking medication, the trial court ruled that his statements to the GBI agents were made freely and voluntarily.[11]

(e) *Analysis*

(i) Torres first argues that the trial court erred in its determination that he was not in police custody when he spoke with

---

[11] The trial court later entered an order denying the motion to suppress.

Sheriff Melton while on the side of the road and that the failure to provide him with *Miranda* warnings renders his statements there inadmissible. We disagree.[12]

"*Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest." (Citation and punctuation omitted.) *DeVaughn v. State*, 296 Ga. 475, 479 (4) (769 SE2d 70) (2015). "Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." (Citation and punctuation omitted.) Id.

Here, the trial court did not err when it determined that Torres was not in custody when he was interviewed by Sheriff Melton. The interview occurred on the side of the road, and Torres was never restrained, arrested, or placed into a patrol car. See *Acosta v. State*, 311 Ga. 320, 325 (1) (a) (857 SE2d 701) (2021) ("[Appellant] was not

---

[12] As to the second and third interviews, Torres was read *Miranda* warnings before each interview, and both times he acknowledged his rights and agreed to waive them. Torres makes no claim in this appeal that he was not provided *Miranda* warnings before those interviews or that they were insufficient.

under formal arrest, and, accepting the trial court's factual findings and credibility determinations, we conclude that a reasonable person in [appellant's] position would not perceive that he was in custody at the time of the first interview."). Although Sheriff Melton had some doubts as to the veracity of Torres's story about how he was shot, he never communicated those doubts to Torres or implied to Torres that he was suspected of committing a crime. See *Schutt v. State*, 292 Ga. 625, 629 (4) (a) (740 SE2d 163) (2013) (holding that appellant's contention that her statement was inadmissible because she was not advised of her *Miranda* rights was meritless in part because, while an officer found the "[a]ppellant's story suspicious, he did not communicate his suspicions to her and at no time implied that she was under arrest").

At the *Jackson-Denno* hearing, Sheriff Melton testified that in the beginning of the interview, the interview was not custodial in nature and that Torres never tried to leave. Sheriff Melton also testified that he was uncertain whether Torres would have been free

to leave.[13] However, whatever beliefs Sheriff Melton or Torres may have had about the custodial nature of the interview, the relevant test here is an objective one. See *State v. Walden*, 311 Ga. 389, 390 (858 SE2d 42) (2021) ("In determining whether a suspect is in custody, we must consider the totality of the circumstances without regard for the subjective views of the suspect or the interrogating officer." (citation and punctuation omitted)). See also *United States v. Moya*, 74 F3d 1117, 1119 (II) (11th Cir. 1996) ("[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."). Here, Torres had been shot and was awaiting an ambulance when Sheriff Melton asked him, "Do you know what happened, buddy?" Moreover, the recordings of the interview show that Torres never asked to leave. See *Teasley v. State*, 293 Ga. 758, 762-763 (3) (a) (749 SE2d

---

[13] Torres notes that Sheriff Melton later testified at the hearing that, when he was speaking with Labaco after Torres had been transported to the hospital, Labaco was "not free to go at that point." Sheriff Melton also testified that his discussion with Labaco "was custodial in nature." The record is clear, however, that Torres was not present by that point in time. Thus, even if Sheriff Melton's interview with Labaco became custodial after Torres was transported to the hospital, that fact has no bearing on whether Sheriff Melton's earlier discussion with Torres was custodial.

710) (2013) (noting, among other factors, that the interviewing officer testified that the suspect was not in custody and never asked to leave while being questioned). Thus, there has been no showing that a reasonable person in Torres's situation would perceive that he was in custody. See *DeVaughn*, 296 Ga. at 479 (4). Therefore, the trial court did not err in determining that, under these circumstances, *Miranda* warnings were not required.

(ii) Torres next argues that the trial court erred by denying his motion to suppress because none of his statements were made voluntarily. We disagree.

In determining whether a defendant's statement was voluntary as a matter of constitutional due process,

> a trial court must consider the totality of the circumstances. The State bears the burden of demonstrating the voluntariness of a defendant's statement by a preponderance of the evidence. In reviewing such a mixed question of fact and law, we accept the trial court's finding on disputed facts and credibility of witnesses unless clearly erroneous but independently apply the law to the facts.

(Citation and punctuation omitted.) *Matthews v. State*, 311 Ga. 531,

540 (3) (a) (858 SE2d 718) (2021). "[W]here controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." (Citation and punctuation omitted.) *Perez v. State*, 309 Ga. 687, 692 (2) (848 SE2d 395) (2020).

As to his first statement to Sheriff Melton on the side of the road, the trial court determined that the statement was made freely and voluntarily. We agree.

Torres specifically claims that his statement from the first interview was involuntary due to being in pain and shock from the shooting during the interview. However, the trial court did not err in its determination that the statement was voluntary under the totality of the circumstances.

"The fact that a defendant is in pain . . . does not, in and of itself, render any statement made involuntary." (Citation and punctuation omitted.) *Sanders v. State*, 281 Ga. 36, 38 (2) (635 SE2d 772) (2006). Moreover, there is no evidence that Sheriff Melton or the deputies threatened Torres or conditioned his receipt of medical care on any statements he provided to them. The trial court made

its determination based on Sheriff Melton's testimony and from reviewing the video recordings taken by body cameras worn by the deputies who accompanied Sheriff Melton. See *Myers v. State*, 275 Ga. 709, 713 (3) (572 SE2d 606) (2002) (holding that a statement to the police was voluntary even though the appellant was in pain where the record showed he was responsive and answered coherently and logically). Even though Torres later asserted that he could not remember speaking with Sheriff Melton, the trial court was not required to credit Torres's testimony, especially in light of recordings and testimony from Sheriff Melton showing that Torres gave coherent and logical answers to the questions he was asked. See *Grier v. State*, 273 Ga. 363, 365 (2) (541 SE2d 369) (2001) (noting that the trial court could accept a police officer's testimony and reject the suspect's self-serving explanation when determining whether a statement was voluntary).

As to the second and third interviews, Torres argues that the combination of pain from his injuries and the effects of medication to treat that pain prevented him from making statements to the

police freely and voluntarily. But the record, particularly the recording of the hospital interview and Special Agent Fitzgerald's testimony about it, supports the trial court's conclusion that Torres was lucid, was able to acknowledge and waive his rights after they were read to him, and was able to understand and respond at length to questions about the incident at the Key West Inn. See *Sanders*, 281 Ga. at 38 (2) (concluding that the statement at issue was voluntary and noting that, although suspect was hospitalized, his pain was under control, he was not groggy, he could engage in meaningful conversation, and he acknowledged and waived his rights after being given *Miranda* warnings). Although Torres had received pain medication, he did not appear to be under the influence of the medication or impaired when he was speaking with Special Agent Fitzgerald. See *Starling v. State*, 299 Ga. 263, 266 (3) (787 SE2d 705) (2016) (determining that a statement was given voluntarily where the suspect, who was hospitalized, had been given a sedative but appeared "rational and coherent" and indicated willingness to speak to police); *Sanders*, 281 Ga. at 38 (2) (holding

26

that even though the defendant made a statement while in the hospital and on pain medication, his statement was voluntary where the record showed that he was not groggy and could engage in meaningful conversation); *Myers*, 275 Ga. at 713 (3) (determining that defendant's statement to the police was voluntary even when the defendant was in the hospital and on pain medication when the video showed that the defendant was alert, responsive, and aware of the identity of the officers).

The record also shows that, without prompting, Torres provided long, narrative answers to Special Agent Fitzgerald that were later verified as correct. See *Starling*, 299 Ga. at 266 (3) (holding that the defendant's statement was voluntary when his answers were rational and coherent and the defendant expressed willingness to talk); *Myers*, 275 Ga. at 713 (3) (same). Torres also never indicated at the time that he was not in a condition to be interviewed.

The trial court also determined that Torres provided a voluntary statement to the agents in the third interview. The court

27

determined that Torres did not appear to be under the influence of medication or impaired when he was speaking with Special Agents Hullander and Fitzgerald at the sheriff's office. See *Starling*, 299 Ga. at 266 (3); *Sanders*, 281 Ga. at 38 (2); *Myers*, 275 Ga. at 713 (3). The record supports these findings. As the trial court also noted, Torres was informed of his rights, and he signed a form acknowledging and waiving them. See *Starling*, 299 Ga. at 266 (3) (concluding that the defendant gave a voluntary statement and noting, as part of that analysis, that the defendant received *Miranda* warnings and signed a waiver form); *Sanders*, 281 Ga. at 38 (2) (same); *Myers*, 275 Ga. at 713 (3) (same).

In light of the foregoing, we see no error in the trial court's determination that Torres's statements to the police were voluntary. His claim of error on that basis therefore fails.

(iii) Torres also claims that his statements to Special Agents Fitzgerald and Hullander were induced by a hope of benefit, namely a shorter sentence, in violation of OCGA § 24-8-824, which provides that "[t]o make a confession admissible, it shall have been made

28

voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." The trial court ruled that neither agent offered a hope of benefit, and we agree.

In contrast to Torres's constitutional argument, which presents the broader question of whether his confession was inadmissible on the basis that it was not voluntary under the totality of the circumstances, his statutory argument involves an evaluation of whether a defendant has been made

> promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all. . . . Under the standard of review applicable to a trial court's decision regarding admissibility under the statutory standard, the reviewing court accepts the trial court's determinations as to the credibility and weight of conflicting evidence unless they are clearly erroneous and independently reviews the trial court's application of the law to the facts. De novo review is appropriate, however, if the controlling facts can be definitively ascertained, exclusively by reference to evidence, such as a recording of a police interview, that is uncontradicted and presents no questions of credibility.

(Citations and punctuation omitted.) *Matthews*, 311 Ga. at 542 (3) (b).

Torres first claims that Special Agent Fitzgerald provided a

hope of benefit when she responded to a question from Torres as to whether he was going to jail for life. However, it is undisputed that the recording of the interview shows that Special Agent Fitzgerald's response to that question was that she was focused on letting him receive medical treatment and that issues regarding charges and sentencing would be handled later: "No, I understand. I understand. The first thing is to get you to the hospital and make sure that all this stuff is okay. . . . That stuff will come later. We'll get it all straightened out."

The trial court determined that this statement did not constitute a hope of benefit, and we agree. Although Special Agent Fitzgerald's statement about getting "[t]hat stuff . . . straightened out" might be understood, at a high level of abstraction, to refer to charges and sentencing, her response, when viewed in context, did not pertain to charges or sentencing. See *Dawson v. State*, 308 Ga. 613, 621 (3) (842 SE2d 875) (2020) (determining that the interviewing officer did not provide a hope of benefit where the officer never "promised" the appellant "that he would not be charged

30

with a crime or that he would receive reduced charges, sentencing or punishment if he made incriminating statements" (citation and punctuation omitted)).

Torres similarly claims that Special Agent Hullander provided a hope of benefit when, after Torres said to him, "Whatever's going to help me out, I'll let y'all know whatever details y'all want," Special Agent Hullander said, "I'm glad to hear that. That tells me a lot about the kind of person that you are." The trial court ruled that Special Agent Hullander never provided a hope of benefit to Torres, and we agree. Special Agent Hullander made no promises to Torres and never mentioned anything about sentencing or charges during the interview. See *Dawson*, 308 Ga. at 621 (3). At most, Special Agent Hullander's response to Torres could be understood to be an expression of thanks to Torres for his willingness to tell the truth or an encouragement to him to do so. As we have discussed, exhorting a suspect to tell the truth does not constitute a hope of benefit within the meaning of the statute. See *Price v. State*, 305 Ga. 608, 611 (825 SE2d 178) (2019).

We thus determine that Torres's statements at the hospital and the sheriff's office were not induced by a "hope of benefit" within the meaning of OCGA § 24-8-824. Accordingly, Torres's claims of error regarding the admission of these statements also fails on that basis.

3. Finally, Torres argues that his retrial on Counts 4, 5, 10, 11, and 14 violated the constitutional prohibition on double jeopardy. We agree with the State, however, that this claim was not preserved for appellate review.

The Fifth Amendment to the United States Constitution guarantees criminal defendants protection against double jeopardy. U. S. Const. Amend. V. The Fifth Amendment's bar against double jeopardy encompasses the doctrine of collateral estoppel, which precludes the re-litigation of an ultimate fact issue that was determined by a valid and final judgment. See *Giddens v. State*, 299 Ga. 109, 112-113 (2) (a) (786 SE2d 659) (2016).[14] Likewise, the

---

[14] "Under this doctrine, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated

Georgia Constitution provides that "[n]o person shall be put in jeopardy of life or liberty more than once for the same offense except when a new trial has been granted after conviction or in case of mistrial." Ga. Const., Art. I, Sec. I, Par. XVIII. Georgia statutory law also provides additional protections against multiple prosecutions. See OCGA § 16-1-7 (prohibiting multiple prosecutions for the same conduct); OCGA § 16-1-8 (providing for circumstances in which successive prosecutions are barred). The doctrine of double jeopardy, as outlined in these authorities, thus has two components: the "procedural" bar on double jeopardy, which limits "multiple prosecutions for crimes arising from the same conduct," and the "substantive" bar, which protects against "multiple convictions or

___

between the same parties in any future lawsuit." (Citation and punctuation omitted.) *Giddens*, 299 Ga. at 112-113 (2) (a). Collateral estoppel therefore precludes "retrial of the factual decisions that necessarily underlie the legal determination of acquittal." Id. at 113 (2) (a). "When there is a critical issue of ultimate fact in all of the charges against the defendant, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." (Citation and punctuation omitted.) *Roesser v. State*, 294 Ga. 295, 296 (751 SE2d 297) (2013). To assert this protection in a subsequent trial, the defendant bears the burden of proving from the record what facts were actually and necessarily decided in his favor in an earlier trial. See *Giddens*, 299 Ga. at 113 (2) (a).

punishments" for such crimes. (Citations and punctuation omitted.) *Neuman v. State*, 311 Ga. 83, 86-87 (2) (856 SE2d 289) (2021).

Here, Torres was charged with six counts of felony murder (Counts 1-6), criminal attempt to commit armed robbery (Count 7), conspiracy to commit armed robbery (Count 8), armed robbery (Count 9), conspiracy to commit aggravated assault (Count 10), aggravated assault with intent to rob (Count 11), aggravated assault with a deadly weapon (Count 12), theft by taking (Count 13), and tampering with evidence (Count 14). See footnote 1. A jury found him guilty of Counts 4, 5, 10, 11, and 14 and not guilty on the remaining counts against him. See id.

Torres filed a motion for new trial, which the trial court granted based on ineffective assistance of counsel. Before his retrial, Torres orally raised a plea in bar based on double jeopardy to bar retrial on Counts 1-3, 6-9, 12, and 13, the counts of which he was found not guilty in his first trial. The trial court deferred ruling on the plea in bar but orally granted it after the close of the State's evidence in the bench trial. The trial court later found Torres guilty

of Counts 4, 5, 10, 11, and 14 and entered an order granting the plea in bar nunc pro tunc as to Counts 1 through 3, 6 through 9, 12, and 13. Torres never filed a plea in bar in regard to Counts 4, 5, 10, 11, or 14, nor did he raise a collateral estoppel claim at any time leading up to or during the bench trial on those counts.[15]

On appeal, Torres argues that, even though his plea in bar as to these counts was granted by the trial court, he was retried on essentially the same offenses of which he had been acquitted by a jury in his first trial because Counts 4, 5, 10, 11, and 14 "have the same elements and therefore constitute the same offense" as the crimes of which he was found not guilty by the jury. Specifically, Torres argues that because the armed robbery charges (of which he was acquitted) and the aggravated assault charges (of which he was found guilty) were all premised on the same incident, by virtue of the jury's acquittal of Torres on the armed robbery charges and the

---

[15] To the contrary, when Torres raised his plea in bar as to the counts for which he had been found not guilty, Torres's counsel told the trial court, "[Torres] can be certainly retried on [Count 4, Count 5, Count 10, Count 11, and Count 14]."

corresponding felony murders, the jury also necessarily found, as a matter of fact, that Torres did not commit the charged aggravated assaults and the felony murders that correspond to them.

It is clear that Torres is claiming that he was subjected to a successive prosecution as to Counts 4, 5, 10, 11, and 14. "Accordingly, any resulting double jeopardy claim was procedural in nature." *Neuman,* 311 Ga. at 87 (2). However, by failing to file a plea in bar as to those counts or otherwise contest the initiation of the second trial as to those counts on the basis of former jeopardy, Torres failed to preserve this question for our review. See id. We thus reject this enumeration of error without addressing the merits of Torres's contention.[16]

*Judgment affirmed. All the Justices concur.*

---

[16] In a reply brief, Torres asserted for the first time that if his double jeopardy claims regarding Counts 4, 5, 10, 11, and 14 were not preserved for review that such inaction amounted to constitutionally ineffective assistance on the part of his trial counsel. However, "an appellant who raises an argument for the first time in a reply brief is not entitled to have that argument considered." (Citation and punctuation omitted.) *Williams v. State,* 307 Ga. 689, 689 n.2 (838 SE2d 314) (2020). Accordingly, we do not consider Torres's assertion that he received ineffective assistance of counsel.

Decided September 20, 2022 — Reconsideration denied October 25, 2022.

Murder. Appling Superior Court. Before Judge Guy.

*Lowther Walker, Joshua S. Lowther, Bingzi Hu*, for appellant.

*Keith Higgins, District Attorney, Benjamin E. Gephardt, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.