307 Ga. 477
FINAL COPY

S19A0995. THE STATE v. RUMPH.

ELLINGTON, Justice.

Pursuant to OCGA § 5-7-1 (a) (4), the State appeals from an interlocutory order of the Superior Court of Columbia County suppressing two statements that Christopher Rumph made to law enforcement officers prior to his arrest on murder and other criminal charges. The trial court suppressed the statements on the ground that the police had failed to give Rumph *Miranda*[1] warnings prior to interviewing him. The State contends that the trial court erred in suppressing the statements because, as Rumph was not in custody, *Miranda* warnings were not required. For the following reasons, we agree and reverse the trial court's order.

"The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances." (Citation and

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

punctuation omitted.) *Norwood v. State*, 303 Ga. 78, 80 (2) (810 SE2d 554) (2018). When reviewing a trial court's ruling on a motion to admit or suppress evidence, "an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). This means that the reviewing court generally must accept the trial court's findings as to disputed facts unless they are clearly erroneous, although the reviewing court may also consider facts that "definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility," such as facts indisputably discernible from audio- or video-recordings. Id. at 746 (1) n. 5. Viewed in this way, the evidence presented at the *Jackson-Denno*[2] hearing, which consisted of the testimony of an investigator and the audio- and video-recordings of the investigator's recorded interviews with Rumph, shows the following.

On November 16, 2016, Jerry Whitten's body was found at his

---

[2] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

place of work, Springwood Nursery in Columbia County. He had been shot to death. Deputies with the Columbia County sheriff's office learned that the last person to see the victim alive was his co-worker, Rumph. The two had worked the night shift together and had driven to various job sites to make deliveries. Shortly after the victim was found dead, the lead investigator, Sergeant Ryan Whittle, telephoned Rumph and asked whether he and another investigator could visit Rumph at his home and ask him some questions about Whitten. Rumph agreed. Thereafter, Whittle spoke with Rumph at Rumph's home. Whittle audio-recorded this first interview.

Whittle testified that he made no threats nor promises to Rumph nor suggested that Rumph was a suspect or under arrest during the interview at Rumph's home. Rather, he informed Rumph that he was investigating Whitten's death and that, because Rumph was the last person to see the victim before he was killed, he wanted to "rule [Rumph] out" as a possible suspect. Whittle testified that he did not give Rumph *Miranda* warnings. Rumph was cooperative and

3

signed a form consenting to a search of his car and clothes. The audio-recording of this interview reveals that Whittle did not say anything to indicate that Rumph was in custody or required to cooperate with the investigation. Rumph did not say that he wanted to stop the interview. In his conversation with Whittle, Rumph described what he and the victim had done that night, where they had made deliveries, and whether anything unusual happened, like whether strangers had followed them or Rumph had seen anyone lurking in the parking lot. Rumph also recounted his activities after he left work that morning, which consisted of going home and resting, then driving around, drinking coffee, and waiting for the Department of Driver Services to open so that he could renew his truck driver's certificate.

After this interview, the investigators left. They returned about 20 minutes later, however, to ask Rumph if he would ride with them to the nursery and show them around the premises. According to Whittle, Rumph agreed. This encounter was not recorded. Whittle testified that Rumph rode in the front seat of the patrol car and that

4

a second investigator rode in the back. Rumph showed Whittle where the victim had parked his car and how employees entered the nursery premises.

Whittle testified that, shortly after visiting the nursery, he asked Rumph to give a video-recorded statement at the sheriff's office substation, and Rumph agreed. Whittle testified that Rumph was not restrained in any way and that he was free to leave at any time, although he did not expressly tell Rumph that. Whittle also testified that he stopped the interview to allow Rumph to take cigarette breaks. Although an officer accompanied Rumph during his breaks, he did so because guests were not allowed to move about unaccompanied through secure areas of the sheriff's office.

The video-recording of the interview shows that the interview room door was often left open and that people entered and exited the room freely, suggesting that it was unlocked. The recording also shows that Rumph had his keys and cell phone with him. During the interview, Rumph received a call from his mother, and he told her that he was in the middle of an interview. He asked his mother if

she would pick him up at the substation after he finished talking to Whittle. Rumph also asked if he could go outside and smoke a cigarette, and he was allowed to do so, accompanied by an officer. After returning from his cigarette break, Whittle offered to take Rumph home so that his mother did not have to pick him up. At the investigator's request, Rumph allowed the investigator to perform a gunpowder residue test and to copy the contents of his cell phone.

The video-recording reveals that Rumph remained in the substation for another hour, often taking long breaks from the interview while Whittle performed other tasks or while Rumph left to take cigarette and coffee breaks. The recording shows that the interview room door was propped open and that, at one point, Rumph returned to the room alone. When the interview resumed, Whittle asked Rumph about his relationship with the victim. Rumph said the two had clashed initially over politics but that they no longer argued. Rumph's mother called again and asked Rumph if he was being forced to talk to the investigators; he emphatically responded "no" and assured his mother that they were just asking

6

him questions about his co-worker. When Rumph's mother pressed the issue, Whittle said "no" loudly so that Rumph's mother could hear him say that Rumph was not required to talk to him. Rumph told his mother that they were "just talking" and that he would be done "in a minute."

After Whittle pointedly questioned Rumph about allegations that Rumph and the victim had a strained relationship, Rumph said that he wanted a lawyer and asked if Whittle was charging him with anything. Whittle responded that he had no intention of charging Rumph. Whittle stopped questioning Rumph, volunteered again to take him home, and then left the room. The video-recording shows that Rumph waited alone while the property clerk returned his phone and had him sign paperwork concerning it. During this time, Rumph left the interview room on his own and asked someone if he could see the detective again. According to Whittle, Rumph declined the offer to drive him home; instead, Rumph called his mother to come get him. The video-recording shows that the detective told Rumph that they were in the process of getting search warrants for

7

his property and home. Shortly thereafter, the recording ends and, according to Whittle, Rumph left the substation and went home.

The investigators later executed a search warrant at Rumph's home. Upon finding a handgun and spent shell casings in Rumph's bedside table drawer, they arrested Rumph on a charge of possession of a firearm by a convicted felon. After the arrest, Rumph asked to speak with Whittle. Whittle conducted a third video-recorded interview. Whittle gave Rumph *Miranda* warnings, and Rumph signed a waiver-of-rights form. Rumph agreed to speak without an attorney present. During this third interview, Rumph claimed for the first time to have a mental condition and that, because of the condition, he was unable to control his behavior.

At the conclusion of the *Jackson-Denno* hearing, the State argued that the recorded statements from the first and second interviews were voluntary and non-custodial and that the third statement, though custodial, was also voluntary and made after Rumph was given *Miranda* warnings. Rumph's attorney objected only to the admission of the third statement. The trial court

admitted Rumph's third statement, finding that it was freely and voluntarily made. However, the trial court summarily ruled that Rumph was in custody when he gave the first two statements and that, because Whittle had failed to give Rumph *Miranda* warnings, which are required prior to custodial interrogation, the first two statements were inadmissible. The trial court made no explicit credibility determinations and did not explain its basis for finding that Rumph's first two statements were custodial.

In general, "*Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." (Citations and punctuation omitted.) *Freeman v. State,* 295 Ga. 820, 822-823 (3) (764 SE2d 390) (2014). Because Rumph had not been formally arrested when he gave the statements that the trial court suppressed, the critical inquiry in this case is whether a reasonable person in Rumph's situation would have perceived that he was in custody. In this case, the record does not

9

support the trial court's finding that Rumph was in custody during his first two interviews. The evidence presented during the *Jackson-Denno* hearing does not support a finding that Rumph was restrained or that a reasonable person in Rumph's situation would have perceived that he was in custody in these circumstances.

With respect to the first interview at Rumph's home, the evidence shows that Whittle telephoned Rumph and asked for and received his permission to speak with him at home prior to going there. Whittle testified that he did nothing to intimidate or coerce Rumph into speaking with him. Further, even if we assume that the trial court rejected Whittle's uncontradicted testimony entirely (even though the trial court did not state anything to that effect during the hearing or in its order), the audio-recording of the interview shows that Whittle did not use harsh, intimidating, or coercive language. Rather, he asked for Rumph's help because Rumph was the last person to see the victim alive. The interview was conversational and consisted primarily of Whittle's efforts to trace the victim's steps and to learn what, if anything, Rumph had

10

witnessed while he was working with the victim. Nothing in the audio-recording suggests that a reasonable person in Rumph's situation would have perceived that he was in custody.

With respect to the second interview, Whittle testified that Rumph agreed to go with the investigators to the sheriff's office to give a statement. Again, even if the trial court rejected Whittle's testimony, the video-recording of the interview does not support a finding that a reasonable person in Rumph's position would perceive that he was in custody. Rumph retained possession of his keys and his phone and was allowed to take phone calls and leave the interview room for breaks. Rumph was often left alone in the interview room, and the door of the room was often propped open. And, during the course of the interview, Rumph spoke with his mother on the phone and told her that he was *not* being forced to talk with the investigator and that he expected to leave the office soon. When Rumph asked if he was being charged with anything, Whittle said "no" and Rumph left the substation shortly thereafter.

11

Because the evidence did not authorize the trial court to conclude that Rumph had been formally arrested or that a reasonable person in Rumph's situation would perceive that he was in custody, *Miranda* warnings were not required. See *Drake v. State*, 296 Ga. 286, 289 (2) (766 SE2d 447) (2014) (The defendant's pre-*Miranda* statements were properly obtained and were admissible because the defendant was not in custody during the initial interview. The evidence reflected that investigators requested rather than demanded to speak with the defendant, the defendant agreed voluntarily to go to the police station, and the defendant was never physically restrained or threatened.). Consequently, the trial court erred in suppressing Rumph's audio- and video-recorded statements on this basis.

*Judgment reversed. All the Justices concur.*

DECIDED DECEMBER 23, 2019.
Murder. Columbia Superior Court. Before Judge Brown.

12

*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Keith B. Johnson*, for appellee.