NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 17, 2024

S23A0842.  THE STATE v. FRANKLIN.

BOGGS, Chief Justice.

Appellee Dequavius Dexter Franklin was indicted for the murder of Jaquon Anderson and related offenses. Appellee filed a generalized motion to suppress, through which he later challenged the introduction of a statement he made to law enforcement while in a hospital on January 4, 2022, and the State filed a corresponding motion in limine to adjudicate the admissibility of the same. After the trial court granted Appellee's motion to suppress the January 4 statement he made to law enforcement on the basis that "the statement was not voluntary" due to Appellee's medication, medical condition, and circumstances surrounding his physical condition, the State appealed pursuant to OCGA § 5-7-1 (a) (4). The State contends that Appellee's statement was voluntary. We agree

because no evidence in the record shows that law enforcement coerced Appellee's statement and accordingly, reverse.

1. When ruling on a motion to suppress, a trial court decides whether a defendant's statement is admissible based on the preponderance of the evidence considering the totality of the circumstances. See *State v. Rumph*, 307 Ga. 477, 477 (837 SE2d 358) (2019). The State bears the burden of proof. See *State v. Hinton*, 309 Ga. 457, 457 (847 SE2d 188) (2020). We have previously explained that "when reviewing a trial court's ruling on a suppression issue, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *Walker v. State*, 312 Ga. 332, 336 (862 SE2d 542) (2021) (cleaned up). In cases where "some or all of the material facts [are] undisputed," we "properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact."

*Hughes v. State*, 296 Ga. 744, 746 n.4 (770 SE2d 636) (2015).[1]

Finally, we review de novo the application of the facts to the law —

that is, the trial court's ultimate conclusion whether, under all the

circumstances, the defendant's statement was voluntary. See

*Doricien v. State*, 310 Ga. 652, 656 (853 SE2d 120) (2020). See also

*Beckwith v. United States*, 425 U.S. 341, 348 (96 SCt 1612, 48 LE2d

1) (1976) ("When [a voluntariness] claim is raised, it is the duty of

an appellate court, including this Court, to examine the entire

record and make an independent determination of the ultimate

issue of voluntariness." (cleaned up)).

2. Viewed in this light, the evidence in the record and presented

at the *Jackson-Denno*[2] hearing showed the following. The arrest

warrant affidavit recited[3] that on December 31, 2021, Detective

Alfred Hogan with the Atlanta Police Department responded to a

---

[1] Such undisputed facts include, among other things, those which "definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility." *Hughes*, 296 Ga. at 746 n.5. Audio- or video-evidence may match that description. See id. See also *Rumph*, 307 Ga. at 477-478.

[2] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[3] We recount the affidavit's factual allegations only for background.

911 call reporting a shooting and armed robbery by two masked assailants at a residence in Fulton County. Detective Hogan discovered Anderson's body lying in the main room of the residence and noticed a large amount of blood on the opposite side of the room from Anderson as well as a black ski mask on the floor near his body. Detective Hogan deduced that the blood on the opposite side of the room did not belong to Anderson, and subsequent investigation led Detective Hogan to believe that Anderson fired shots during the robbery and injured an assailant and that the injured assailant fled, leaving the blood and ski mask behind. Detective Hogan learned while responding to the 911 call that someone wearing a black ski mask delivered Appellee to Emory Hospital Midtown ("Emory") and that Appellee was suffering an abdominal gunshot wound.[4]

Appellee's medical records were introduced at the hearing, but there was no testimony offered about the records. Those records show that Emory transferred Appellee to Atlanta Medical Center

---

[4] While at Emory, Appellee made a statement to law enforcement. The trial court's ruling that this statement was admissible is not at issue on appeal.

("AMC") for surgery to remove his spleen, left kidney, and pancreas and to repair his abdomen. AMC administered propofol, fentanyl, and other medication to Appellee for anesthesia and pain relief. On January 3, 2022, Appellee underwent a second surgery due to respiratory failure and blood loss anemia and received nourishment through a feeding tube.

Detective Hogan testified at the hearing that during his investigation, he narrowed the suspects down to Appellee and a second, unidentified person. Detective Hogan obtained a search warrant for Appellee's DNA, and on January 4, 2022, he obtained the permission of hospital staff to interview Appellee and did so in his hospital room; the interview was audio-recorded. Before the interview he "ma[d]e efforts to make sure that [Appellee] was physically and mentally capable and well enough to speak with [him] during [the] investigation" by contacting hospital staff. During the interview, only Detective Hogan and Appellee were in the room, although nurses occasionally entered and exited. Detective Hogan testified that Appellee was not under arrest at the time; that he had

5

not obtained an arrest warrant for Appellee; that Appellee was not in handcuffs; and that neither Appellee's hands nor feet were bound together. Detective Hogan further testified that he believed that Appellee comprehended English, understood the questions, and answered the questions. Before leaving he executed the search warrant for Appellee's DNA by obtaining a buccal swab. He intended to seek an arrest warrant for Appellee if the DNA results placed Appellee at the crime scene.

The medical records show that Appellee remained in the hospital until January 19, 2022. According to Detective Hogan's testimony and the arrest warrant affidavit, Detective Hogan later learned that the DNA at the crime scene matched that of Appellee. After the arrest warrant was issued, Detective Hogan arrested Appellee.

Following the hearing, the trial court granted Appellee's motion to suppress the January 4 statement. In its order, the trial court considered the testimony of Detective Hogan set forth above, referenced Appellee's medical records, and concluded:

6

Based on this medical history it is readily apparent that the statement the State is attempting to admit should not be admitted as Mr. Franklin was in no physical or mental condition to give a knowingly voluntary statement or waive his Fifth Amendment privilege.

Due to the medication the Defendant was receiving, his medical condition and the circumstances surrounding the Defendant's physical condition, this Court exercises its[] discretion and finds that the statement was not voluntary and is inadmissible in the trial of this case.

3. The State argues that the trial court erred in excluding the statement on the ground that it was "not voluntary." We agree.

At the outset, we note that we read the trial court's order as ruling that Appellee's statement was involuntary under the Due Process Clause of the Fourteenth Amendment because the order focuses on "the medication [Appellee] was receiving, his medical condition and the circumstances surrounding [his] physical condition." See *State v. Chulpayev*, 296 Ga. 764, 779 (770 SE2d 808) (2015) (distinguishing statutory and constitutional voluntariness analyses). Although the issues of whether Appellee's statement was involuntary under OCGA § 24-8-824 and whether he should have been notified of his rights under *Miranda v. Arizona*, 384 U.S. 436

(86 SCt 1602, 16 LE2d 694) (1966), were raised by the parties, the trial court's order does not expressly make such rulings, and we do not read the trial court's order as making those determinations, so we need not address them.

Constitutionally, the Due Process Clause of the Fourteenth Amendment demands that a confession or inculpatory statement be "the product of a rational intellect and a free will" under the totality of the circumstances.[5] *Blackburn v. Alabama*, 361 U.S. 199, 206, 208 (80 SCt 274, 4 LE2d 242) (1960). See also *Doricien*, 310 Ga. at 657; *Chulpayev*, 296 Ga. at 771 (explaining "that the rule as to the admissibility of an incriminatory statement is the same as that applied to a full confession" (cleaned up)). The Supreme Court of the United States has held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth

---

[5] Appellee did not clearly raise a claim under the Due Process Clause of the Georgia Constitution, so we need not address whether the same analysis would apply under the federal and state Due Process Clauses. See Ga. Const. of 1983, Art. I, Sec. I, Par. I.

8

Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (107 SCt 515, 93 LE2d 473) (1986). In *Connelly*, the Supreme Court reversed the suppression of a confession that a defendant gave "without any prompting" by law enforcement and due to voices in his head that demanded he confess. Id. at 159-163. The Supreme Court observed that, although the mental condition of a defendant had become the focus of voluntariness analyses "as interrogators . . . turned to more subtle forms of psychological persuasion," the Supreme Court's involuntariness cases remained "focused upon the crucial element of police overreaching." Id. at 163-164. The Supreme Court further explained that requiring "state action" for a due process violation was consistent with the general principle that "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause" and avoided applying the exclusionary rule when it would not deter constitutional violations by the government. Id. at 165-166.

In the context of statements made by a defendant while

intoxicated or under the influence of drugs, we have explained that we determine whether a statement is involuntary by examining the totality of the circumstances, including "lucidity, coherency, manner of speech, and awareness of circumstances."[6] *Evans v. State*, 308 Ga. 582, 587 (842 SE2d 837) (2020). We take this opportunity to clarify that the totality-of-the-circumstances standard we use to evaluate voluntariness claims includes *Connelly*'s coercion predicate. Cf. *Nordahl v. State*, 306 Ga. 15, 20 (829 SE2d 99) (2019) (observing the "fundamental principle that this Court is bound by the Constitution of the United States as its provisions are construed and applied by the Supreme Court of the United States" (cleaned up)). Thus, even if a defendant gives a statement while significantly intoxicated or influenced by drugs, the statement is not involuntary as a matter of constitutional due process absent some evidence of coercive conduct by law enforcement in eliciting the statement. See *Connelly*, 479

---

[6] Of course, those factors are neither required nor exclusive. Cf. *Clark v. State*, 315 Ga. 423, 429 (883 SE2d 317) (2023) (disapproving specific nine-factor framework to determine whether a juvenile knowingly and voluntarily waived his or her *Miranda* rights under the totality of the circumstances).

U.S. at 164-167.

Although we have not always clearly expressed the necessary predicate of coercion,[7] our decisional law has incorporated this predicate. See *Torres v. State*, 314 Ga. 838, 849 (878 SE2d 453) (2022) (concluding that the defendant's statement, given while recovering from a gunshot wound, was voluntary, in part due to the absence of evidence that officers threatened the defendant or conditioned his receipt of medical care on his providing a statement to them); *Starling v. State*, 299 Ga. 263, 266 (787 SE2d 705) (2016) (rejecting the defendant's argument "that the trauma of the shooting, his recent surgery, and the pain medications he was taking at the time rendered him incapable of knowingly and voluntarily waiving his rights and making a statement" because, among other things, there was no evidence that any promises or threats had been made in connection with the interview); *Rivera v. State*, 282 Ga. 355, 359-360 (647 SE2d 70) (2007) (affirming admission of statements

---

[7] See, e.g., *Russell v. State*, 309 Ga. 772, 775-777 (848 SE2d 404) (2020); *Clay v. State*, 290 Ga. 822, 826-827 (725 SE2d 260) (2012); *Myers v. State*, 275 Ga. 709, 713 (572 SE2d 606) (2002).

obtained while the defendant was in a hospital where the defendant "was neither threatened nor coerced"). That is because "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164. See also *State v. Troutman*, 300 Ga. 616, 619 (797 SE2d 72) (2017) ("Likewise, though [the defendant's] mental state and intellectual disabilities are factors to be considered, those factors without more — i.e., deliberate tactics calculated to break the will of the suspect — are insufficient to support a conclusion of coercive police activity." (cleaned up)). Because coercive police conduct is a necessary predicate for a claim that a defendant's statement was not voluntary, the mere fact that a person is taking medication or recovering from injury is not sufficient support for a conclusion that the statement was not voluntary. See, e.g., *Torres*, 314 Ga. at 849; *Rivera*, 282 Ga. at 359-360. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the

due process inquiry." *Connelly*, 479 U.S. at 165. See also *Troutman*, 300 Ga. at 618-619.

Here, the trial court erred to the extent that it concluded that Appellee's statement was involuntary under the Due Process Clause without considering whether there was coercive police conduct. Instead, the trial court reached its conclusion based on "the medication [Appellee] was receiving, his medical condition and the circumstances surrounding [his] physical condition." The trial court cited no authority at all in support of its conclusion, much less any decisions supporting the conclusion that a statement was involuntary based only on such reasoning, and settled precedent from the United States Supreme Court and this Court are to the contrary.

The first two of the trial court's bases for concluding that the statement was not voluntary referred to Appellee's medical condition. But as we have just discussed, a defendant's medical condition — whether pain, the effects of medication, or some other physical condition — is not by itself sufficient to render a statement

13

involuntary. See *Connelly*, 479 U.S. at 165; *Troutman*, 300 Ga. at 618-619. See also *Torres*, 314 Ga. at 849; *Brown v. State*, 304 Ga. 435, 440 (819 SE2d 14) (2018); *Rivera*, 282 Ga. at 359-360.

The trial court's third reason for concluding that Appellee's statement was involuntary — "the circumstances surrounding [his] physical condition" — is also arguably grounded only in Appellee's medical condition. But even assuming the trial court could have been referring to something besides his medical condition or the influence of medication alone, we see no evidence in the record of any non-medical, coercive "circumstances surrounding [Appellee's] physical condition" that could support a conclusion that Appellee's statement was not voluntary as a matter of due process. We reiterate that any such conclusion must rest on some evidence of coercive police conduct, see *Connelly*, 479 U.S. at 164-167; *Troutman*, 300 Ga. at 618-619, but no such evidence appears in the record before us. The trial court's order makes no mention of coercion, much less any finding that Detective Hogan engaged in any manner of coercive conduct; Appellee has never argued that any part

14

of the record showed coercive police conduct of any kind; and even viewing the record in the light most favorable to the trial court's findings and judgment, see *Walker*, 312 Ga. at 336, no such conduct is apparent. Absent evidence of coercive police conduct, and considering all the circumstances here, we conclude that Appellee's January 4, 2022, statement to Detective Hogan was voluntary. See *Connelly*, 479 U.S. at 167. See also *Torres*, 314 Ga. at 849; *Troutman*, 300 Ga. at 618-619; *Starling*, 299 Ga. at 266; *Livingston v. State*, 264 Ga. 402, 408 (444 SE2d 748) (1994) ("Regardless of a suspect's mental state, coercive police activity is a necessary predicate to the finding that his confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. As there is no evidence of coercive police activity in this case, [the defendant's] contention that his statements were not voluntary under the Fourteenth Amendment must fail." (cleaned up)); *Wilson v. State*, 257 Ga. 444, 448 (359 SE2d 891) (1987) (applying *Connelly* to reject the defendant's argument that, even in the absence of any evidence of law enforcement coercion, his

15

statement was involuntary due to his alleged insanity).

Accordingly, we reverse the trial court's order suppressing Appellee's statement.

*Judgment reversed. All the Justices concur.*

WARREN, Justice, concurring.

I agree wholeheartedly with the majority's conclusions that the trial court did not apply the correct legal test in evaluating whether Franklin's statement to Detective Hogan was voluntary; that Franklin did not contend that the record showed coercive police conduct; that no such evidence is apparent from the record on appeal; and that we should reverse the trial court's suppression order as a result.

I write separately, however, to flag my concern about an issue related to the review of video and audio recordings contained in records on appeal. Specifically, I am concerned about extending to audio recordings our approach to reviewing video recordings, which the majority opinion touches on here in footnote 1.

\*

It is well established that when reviewing a trial court's grant or denial of a motion to suppress "in which the trial court has made express findings of disputed facts," this Court's scope of review is

17

limited. *Hughes v. State*, 296 Ga. 744, 746 (770 SE2d 636) (2015).

We have summarized that review as follows:

> First, an appellate court generally must accept those findings unless they are clearly erroneous. Second, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. And third, an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court.

Id. at 746 (cleaned up).

> On the other hand, we have noted that in cases where

> some or all of the material facts may be *undisputed*, as where the defendant concedes a fact unhelpful to his cause in his motion to suppress, where the State admits a fact unhelpful to its case in connection with the motion, or where the State and defendant expressly stipulate to a fact[,] . . . an appellate court properly may take notice of the undisputed facts—even if the trial court did not—without interfering with the prerogative of the trial court to resolve disputes of material fact.

Id. at n.4 (emphasis added).

As the majority opinion notes, video recordings in the record

are one potential source of "undisputed facts" of which an appellate court may "take notice." *Hughes*, 296 Ga. at 746 & n.5. Cf. *Walker v. State*, 312 Ga. 332, 336 (862 SE2d 542) (2021); *Vergara v. State*, 283 Ga. 175, 178 (657 SE2d 863) (2008), disapproved of on other grounds by *Clark v. State*, 315 Ga. 423 (883 SE2d 317) (2023); *Green v. State*, 275 Ga. 569, 572 & n.11 (570 SE2d 207) (2002). We have emphasized the limited scope of this approach; we may take notice only "to the extent that material facts definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility." *Hughes*, 296 Ga. at 746 n.5 (citing *Vergara*, 283 Ga. at 178).

I acknowledge that we have occasionally applied the same principle to an audio recording. See, e.g., *Mitchell v. State*, 314 Ga. 566, 573 (878 SE2d 208) (2022); *Taylor v. State*, 312 Ga. 1, 9 (860 SE2d 470) (2021); *Rosser v. State*, 308 Ga. 597, 605 (842 SE2d 821) (2020); *State v. Rumph*, 307 Ga. 477, 481 (837 SE2d 358) (2019); *State v. Estrada*, 300 Ga. 199, 199 (794 SE2d 103) (2016). But as far as I can tell, this Court did so without grappling with potentially

19

relevant and material differences between video and audio recordings. See, e.g., *Mitchell*, 314 Ga. at 573 (looking to uncontradicted facts in audio-recorded statements to determine whether OCGA § 24-8-824 was violated when a defendant made statements to law enforcement, but citing for that proposition a case in which we referenced only "a recording of a police interview"); *Taylor*, 312 Ga. at 9 (looking to undisputed facts in an audio-recorded statement to determine whether the defendant unambiguously invoked his right to counsel under the United States Constitution, but citing for that proposition a case in which we took notice of undisputed facts from a video-recorded statement); *Rosser*, 308 Ga. at 605 (looking to undisputed facts from an audio-recorded statement to analyze whether OCGA § 24-8-824 was violated when the defendant made a statement to law enforcement, but citing for that proposition a case in which we took notice of undisputed facts from only a video-recorded statement); *Rumph*, 307 Ga. at 480-481 (looking to undisputed facts from one audio- and one video- recorded statement, and noting that the trial court had not made express

credibility findings related to either recording and that the defendant did not object to the admission of either recording); *Estrada*, 300 Ga. at 200 (looking to undisputed facts from two audio-recorded statements to determine if the defendant unequivocally invoked his right to counsel under the United States Constitution during the statements, but citing for that proposition a case in which we took notice of undisputed facts from only a video-recorded statement). Those differences might include more easily correlating a voice with the person who is speaking, being able to visually identify a person's body language, and being able to visually identify overt acts of coercion that an audio tape might not reveal, just to name a few.[8] I am thus concerned that extending this principle to audio recordings may be more fraught than we realize.[9]

---

[8] Practically speaking, these differences might mean that parties have more to dispute with respect to the contents of an audio recording than they would for a video recording.

[9] That our review of video recordings is limited to ascertaining and taking notice of *undisputed* facts should cut against most concerns about that principle or its extension to audio recordings. And we have conducted a review of this type for both video and audio recordings where a defendant did not object to the introduction of such recordings into evidence. Cf. *Rumph*, 307 Ga.

21

Nevertheless, my concern about how we define and apply these principles to video and audio recordings does not affect the bottom line in this case. That is because we need not take notice of any facts in the audio-only recording of Detective Hogan's interview of Franklin to conclude that Franklin's claim fails. To that end, the record shows that Franklin did not even raise (let alone offer evidence of) the specter of law-enforcement coercion in hearings before the trial court—hearings that included testimony and other evidence beyond just the audio recording of his interaction with Detective Hogan—and the trial court did not find that any type of

---

at 480 (looking to undisputed facts from one audio- and one video-recorded statement; defendant's counsel interposed objections to neither). I remain concerned, however, that a lack of precision in how we have historically explained this limited review could lead to appellate courts reviewing video recordings in a manner that extends beyond taking notice of undisputed facts and resembles something more like the fact-finding trial courts generally conduct in the first instance. Compare, e.g., *Vergara*, 283 Ga. at 178 ("'[W]here controlling facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo.'") (quoting *Lyons v. State*, 244 Ga. App. 658, 659 (535 SE2d 841) (2000)) and *Lyons*, 244 Ga. App. 659 ("Where controlling facts are not in dispute, however, such as those facts discernible from a video tape, our review is de novo.") (citing *Vansant v. State*, 264 Ga. 319, 320 (443 SE2d 474) (1994)) with *Vansant*, 264 Ga. at 320-321 ("[W]here the evidence is uncontroverted and no question regarding the credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review."). Any such concern would be amplified if applied to audio recordings for the reasons described above.

22

coercion had taken place. I therefore do not view footnote 1 as being part of the majority opinion's holding, and we can save for another day a more comprehensive examination of the issues I note above.