NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 30, 2025

S25A0887. HILL v. THE STATE.

ELLINGTON, Justice.

Hunter Nicholas Hill appeals his convictions for malice murder and other crimes in connection with the shooting death of Justin McKinney and the non-fatal shooting of Anna Franklin.[1] Hill

---

[1] The crimes occurred on December 4, 2018. On February 21, 2019, a Fannin County grand jury indicted Hill, Stephan Blake Dickey, Dalton Levi Manuel, Kevin Jack Chamaty, and Michael Chase Havard for malice murder, felony murder, criminal attempt to commit malice murder, criminal attempt to commit armed robbery, five counts of aggravated assault, one count of aggravated battery, two counts of home invasion in the first degree, and one count each of burglary in the first degree and violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, OCGA § 16-14-4(c). Hill, Dickey, and Manuel were also charged with possession of a firearm during the commission of a felony, and Chamaty and Havard were charged with the offense of tampering with evidence. Prior to the indictment, Lakota Ricky Cloer entered guilty pleas related to his participation in the crimes, and he was not charged in the indictment. Manuel, Chamaty, and Havard also entered guilty pleas. Dickey was tried separately from Hill and was convicted of malice murder and other crimes. Dickey is separately appealing his convictions.

After a jury trial that ended on June 28, 2022, Hill was found guilty on all counts. On June 30, 2022, Hill was sentenced to serve life in prison for malice murder, consecutive prison terms of 25 years for attempted murder and

contends that the trial court erred by admitting his custodial statements, altering a suggested pattern jury instruction, and admitting an autopsy photograph. For the reasons explained below, we affirm.

As summarized below, the evidence presented at trial showed that Hill formulated a plan to rob and murder McKinney and McKinney's longtime girlfriend, Franklin, and that Hill led several of his friends to the victims' house, where co-indictee Stephan Blake Dickey shot and killed McKinney, and co-indictee Dalton Levi Manuel shot and wounded Franklin. Dickey did not testify at Hill's trial, but Manuel and three other friends – Lakota Ricky Cloer, Kevin Jack Chamarty, and Michael Chase Havard – gave detailed testimony about the plan that Hill devised and their roles in

five years for the firearms count, and concurrent prison terms of 30 years for attempted armed robbery, 20 years for each home invasion count, and 20 years for the RICO count. The felony murder count was vacated by operation of law, and the remaining counts were merged into the crimes for which Hill was sentenced. Hill filed a timely motion for new trial, which he amended on January 12, 2024, and July 16, 2024. The trial court denied Hill's amended motion for new trial on August 23, 2024. Hill filed a timely notice of appeal, and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

carrying out that plan, and Manuel testified that he shot Franklin and saw Dickey shoot McKinney. Franklin testified that Hill was present during the shooting.

In early December 2018, Hill and five friends, three of whom were juveniles, discussed his plan to rob and kill McKinney, leave no witnesses, and split the proceeds. McKinney sold illegal drugs for "a number of years," and his customers included Hill and his family – who lived with McKinney and Franklin for a little while – as well as Dickey's father. On the evening of December 3, 2018, Hill and his five friends met to discuss robbing and killing McKinney and Franklin, as revenge for McKinney's supposed sale of "bad drugs" to Hill's brother that caused him to overdose and be hospitalized. Hill, Dickey, and Manuel were 15 years old at the time, and another friend, Cloer, was 16 years old. The other two friends, Chamaty and Havard, who were 20 years old, decided not to join the others.

After 11:00 p.m., Cloer drove Hill, Dickey, and Manuel to the victims' house while Hill gave directions. During the drive, the group decided that Dickey would shoot McKinney, Hill would shoot

3

Franklin, Manuel would be the lookout, and Cloer would be the getaway driver. After Cloer dropped off the others, Hill knocked on the door, told the victims a story about being "kicked out of" a friend's truck, and was invited inside the house. Dickey and Manuel let themselves in through the unlocked door shortly thereafter and met Hill and the victims in their living room.

After a short visit, McKinney said it was time for Hill, Dickey, and Manuel to go. While McKinney was dousing a fire in his woodstove, Dickey shot McKinney in the back of the head with a .410-caliber shotgun that Dickey had gotten from Hill, causing McKinney's death almost instantly. Hill, who was armed with a .380-caliber pistol, "froze," and Manuel shot Franklin in the face with a .25-caliber pistol that he had obtained from Cloer. Manuel grabbed Hill, and the three perpetrators fled.

In the meantime, Cloer's vehicle ran out of gas, Chamaty and Havard brought him some, and the three of them eventually picked up Hill, Dickey, and Manuel. After being picked up, Hill claimed, "I blew her head off," and later that evening, Manuel hid the shotgun

under his mattress, and Cloer, Chamaty, and Havard threw the .25-caliber pistol into a nearby lake.

Franklin survived the shooting, called 911 at 12:54 a.m., and reported that Hill and Dickey were present at the shooting, although she could not say who fired the shots. Franklin's injuries were consistent with injuries caused by projectiles fired from a .25-caliber pistol. A .25-caliber pistol was recovered from the lake and matched to .25-caliber shell casings found at the scene. And .410-caliber cartridge casings found at the scene were matched to the .410-caliber shotgun found under Manuel's mattress.

Around lunchtime on December 4, investigators went to Hill and Dickey's high school and asked them to go with the investigators to the sheriff's office, and they agreed. Dickey confessed to shooting McKinney with the .410-caliber shotgun. Hill waived his constitutional rights and was interviewed by GBI Assistant Special Agent Dustin Hamby for almost two hours. Hill initially denied ever having been in the victims' house. Hill later stated that he shot McKinney and Franklin, and though Hill repeatedly minimized or

5

omitted the extent of his friends' involvement, he subsequently admitted that he did not shoot McKinney. After Hill stopped the interview and a different officer was sitting with him, Hill stated, unprompted: "The reason we did it was because he had sold drugs to my brother, and he overdosed, and I'd do it again."

1. Hill contends that the trial court erred in denying his motion to suppress his custodial statements on the ground that he did not voluntarily and knowingly waive his rights pursuant to *Miranda v. Arizona*, 384 US 436 (1966). In support of this contention, Hill argues that he did not "understand what was going on" because he was young and inexperienced, had a learning disability, had difficulty reading, processed information slowly, lacked sleep, and had used illegal drugs. Hill complains that Agent Hamby impaired Hill's understanding by telling him that reading the *Miranda* rights did not mean he was under arrest. Hill also argues that he did not understand the severity of the situation because, even after confessing, he still asked if he could go home. Finally, Hill argues that Agent Hamby, who admitted to moving closer to Hill and to

6

talking to him in a repetitious way for 20 minutes straight, "essentially intimidat[ed] Hill." We conclude that the trial court did not err in denying Hill's motion to suppress based on the totality of the circumstances.

The waiver inquiry has two distinct requirements: first, the "waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and, second, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 US 370, 382-83 (2010) (citation and quotation marks omitted). "[T]rial courts are to use a totality-of-the-circumstances test to determine whether a juvenile knowingly and voluntarily waived his constitutional rights." *Clark v. State*, 315 Ga. 423, 429 (2023). That "test requires trial courts to consider all of the relevant circumstances surrounding a juvenile's interview with law enforcement officials to determine whether the State has met its burden of showing" that the juvenile knowingly and voluntarily waived his constitutional rights. Id. at

7

437. See also id. at 434 ("[P]roper application of a totality-of-the-circumstances test mandates inquiry into *all the circumstances* surrounding the interrogation." (citation and punctuation omitted)); id. at 429, 434-35 & n.16 (stating that "any prescriptive or fixed list of factors by its very nature risks undermining a totality-of-the-circumstances test" and disapproving any language in prior cases indicating that a specific nine-factor framework to determine whether a juvenile knowingly and voluntarily waived his *Miranda* rights is required or exclusive).

When reviewing whether a defendant knowingly and voluntarily waived his *Miranda* rights, we generally "review a trial court's factual findings and credibility determinations for clear error and apply the law de novo." *Sinkfield v. State*, 318 Ga. 531, 540 (2024). "We have previously explained that when reviewing a trial court's ruling on a suppression issue, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *State v. Franklin*, 318 Ga. 39, 39 (2024) (citation and quotation marks omitted). "In

8

cases where some or all of the material facts are undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact." *State v. Tripp*, 320 Ga. 536, 547-48 (2024) (citation and quotation marks omitted). "Such undisputed facts include, among other things, those which definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility. Audio or video evidence may match that description." *Quintanar v. State*, 322 Ga. 61, 65-66 (2025) (citation and quotation marks omitted). "Finally, we review de novo the application of the facts to the law — that is, the trial court's ultimate conclusion whether, under all the circumstances, the defendant's statement was voluntary." Id. at 66 (citation and quotation marks omitted).

The trial court here discussed the evidence with the parties at some length at the hearing on Hill's motion to suppress  but made no explicit findings and later denied the motion "[a]fter considering the totality of circumstances that occurred during Mr. Hill's

statement." The parties have not raised any dispute about the words or the conduct occurring in the recorded interview or about any other evidence related to the interview.

Agent Hamby's testimony at the hearing on the motion to suppress, together with the audio recording of Hill's custodial statement, shows the following. On the day of the shooting, after arrest warrants were taken out for Hill and Dickey, Agent Hamby and the GBI case agent went to the high school and told Hill and Dickey that they would like to speak with them about Justin McKinney, and Hill and Dickey agreed. Hill rode to the sheriff's office with Agent Hamby in a different vehicle from Dickey and was handcuffed during the drive for security reasons, which was conveyed to Hill. At the sheriff's office, Hill was placed in a room separate from Dickey, and Hill's handcuffs were removed. Before beginning the interview, Agent Hamby slowly read Hill his *Miranda* rights verbatim from a GBI card, asking Hill whether he understood each right. Hamby told Hill that the warnings did not mean he was under arrest, though Hamby testified at the motion hearing that

Hill was going to be arrested regardless of what he said in the interview. Hill affirmed that he understood each right as it was read to him. Agent Hamby informed Hill that he did not have to speak with Hamby if he did not want to, but Hill agreed to speak with him.

Hill was six days shy of his 16th birthday and in tenth grade when he was interviewed. An academic document from the ninth grade showed that Hill had a learning disability that negatively impacted his academic progress and that he had slower processing of information and an inability to comprehend grade level text and vocabulary, making it challenging for Hill to be successful in a general education setting without help and accommodation.. The document also showed, however, that Hill increased his score in English, math, science, and social studies over the previous year, was "very attentive" in class, participated in class discussions and completed in-class assignments, had strong skills in math, and tried to work ahead to make up any missed lessons.[2] During the

___

[2] Another academic document from the third grade was also admitted at the hearing and showed, among other things, that he was having difficulties

11

interview, Hill did not recall the number of his street address or his social security number, but Agent Hamby stated that many interviewees he had encountered have had learning disabilities and similarly that many interviewees did not know their social security number. Although Hill said that he "smoked weed" at the victims' house, he did not appear to be under the influence of any drugs or alcohol, or suffering from any mental illness at the time of the interview. Hill's father noticed that Hill and Dickey were awake at 2:00 or 2:30 a.m. on the night that the crimes occurred, but Agent Hamby said that "in no way did [Hill] ever appear to fall asleep or be tired." Agent Hamby testified that "the fact that [Hill] was having an intelligent conversation with me and understood the questions that I was asking and giving consistent answers with the questions that I was asking made me believe that obviously he was coherent and understood fully what was going on." Hamby did not have "any kind of worries or doubts as to the cognitive abilities [of

---

with reading and had made little progress at that point but was "age appropriate for his grade level."

Hill] to actually understand and answer [the] questions."

Hill never asked to speak with an attorney or a parent at any point but only inquired whether his father knew he was at the sheriff's office. Agent Hamby told Hill that he had tried to contact Hill's father but received no response, and Hamby confirmed with Hill that he had the right contact number. Agent Hamby never threatened Hill or promised him any benefit for consenting to the interview. Hill was provided with water, was not denied food or bathroom access, and had a five-minute break that occurred about halfway through the interview.

During the interview, Hill appeared to know what happened to McKinney and understand the severity of the matter. Hill lied about specific details, even minor ones, and about his friends' involvement. Hill changed his story, initially saying that he had never been to McKinney's house and did not know what had happened to McKinney, but later saying that he had helped McKinney move in one day and that he was at McKinney's house the previous night. Hill said he used a .410 shotgun to shoot McKinney but, when

13

confronted with Dickey's confession, agreed that Dickey fired the fatal shot. Although Hill briefly agreed with the suggestion that Dickey shot Franklin, Hill otherwise maintained that he shot Franklin with a .25-caliber weapon and omitted Manuel from his account. Hill also said that, when Cloer dropped Hill and Dickey off and later picked them up, Cloer did not know what was happening, but Hill admitted that Cloer saw the shotgun. When Hill asked Agent Hamby if he could promise that Cloer would not get in trouble, Hamby responded that he could not make any promises.

Agent Hamby explained that he used the GBI-recommended "Reid technique" with Hill. Hamby began the interview by asking open-ended questions and allowing Hill to provide specific details before being interrogated on specific points. About halfway through the interview, Agent Hamby began doing most of the talking for about 20 minutes, repeatedly trying to rationalize Hill's behavior. In the last few minutes of the interview, Hill asked if he could go home that day, and Agent Hamby told him he could not, although Hamby did not tell Hill he was formally under arrest during the interview.

The interview concluded when Hill said he did not want to answer any more questions.

Contrary to Hill's specific arguments set forth above, the trial court did not err by determining that he voluntarily and knowingly waived his *Miranda* rights. The audio recording of Hill's interview and Agent Hamby's testimony supports that – despite Hill's relative youth and inexperience, lack of sleep and use of marijuana the night before, and mixed academic reports – his responses were consistently coherent, and he did not appear to be impaired. See *Clark*, 315 Ga. at 430 & n.12 (Whether a juvenile knowingly and voluntarily waived his rights depends on the totality of the circumstances and not age alone.); *Huffman v. State*, 311 Ga. 891, 894 (2021) (holding that the appellant "need not have had experience with the justice system to understand what was said during the reading of his *Miranda* rights"); *Griffin v. State*, 309 Ga. 860, 868 (2020) (stating, where the appellant contended that "he was too drunk and sleepy to knowingly and voluntarily waive his rights prior to his police interview," that "courts look to the totality of the

circumstances and consider factors including lucidity, coherency, manner of speech, and awareness of circumstances" (citation and punctuation omitted)); *Hopwood v. State*, 307 Ga. 305, 306 (2019) (holding that the trial court did not err by admitting the defendant's statements to an investigator where the defendant "did not appear to be intoxicated or otherwise unable to voluntarily waive her rights," the record did not show the defendant "suffered from any mental incapacity at the time she made her statement," and the defendant "appeared to understand and voluntarily waive her rights"); *Colton v. State*, 296 Ga. 172, 178-179 (2014) ("[T]he fact that a defendant is of below average intelligence … does not, in and of itself, warrant the exclusion of the defendant's inculpatory statement; there must be additional and sufficient evidence that the defendant did not have the capacity to understand and knowingly waive his *Miranda* rights…. Even though [the appellant's] academic records may have reflected a less-than-average intellectual range, they by no means established that [he] was incapable of understanding and knowingly waiving his *Miranda* rights…. There

was no other evidence offered … to negate the positive showing by the State that [the appellant] was not impaired by internal or external factors so as to be unable to understand his rights, knowingly waive them, and voluntarily make his inculpatory statement about the fatal encounter." (citations and quotation marks omitted)).

The fact that Agent Hamby told Hill that reading the *Miranda* rights did not mean he was under arrest did not impair either the understanding of the *Miranda* rights that Hill expressed or Agent Hamby's assurance that Hill did not have to speak with Hamby. See *Hinkson v. State*, 310 Ga. 388, 401 (2020) (When the interviewing detective told the appellant that if he wanted to speak with the detective, he needed to sign a waiver-of-rights "form that 'basically just says you've been advised of your rights, has no bearing on anything else,' that did not diminish the fact that [the appellant] said that he understood the *Miranda* warnings that were given to him orally and understood that he could, but did not have to, speak with [the detective]."). Although Hill asked if he could go home after

17

confessing, he nevertheless showed an understanding that the situation was serious and that his friends could be in trouble for their participation in the crimes, and Agent Hamby never indicated that Hill could avoid negative consequences by confessing, nor did Hamby otherwise contradict the *Miranda* warnings. See *Williamson v. State*, 305 Ga. 889, 894 (2019) (rejecting the appellant's argument that he did not understand the *Miranda* rights he purportedly waived where the appellant indicated he understood the potentially serious negative consequences of inculpatory remarks and where the interviewing officers urged him to confess but did not make any affirmative misrepresentations that contradicted the *Miranda* warnings). Finally, the mere fact that Agent Hamby admitted that he moved closer to Hill and talked to him in a repetitious way for 20 minutes, without more, does not show that his *Miranda* waiver was the product of "intimidation, coercion, or deception" rather than "a free and deliberate choice." See *Berghuis*, 560 US at 382-383. Considering all the circumstances here, including Agent Hamby's testimony and the audio recording, we conclude that the trial court

did not err in denying Hill's motion to suppress.

2. Hill contends that the trial court erred in its charge to the jury when it added the word "age" to the last sentence of the suggested pattern jury instruction on sympathy as follows: "In deciding this case, you should not be influenced by sympathy or prejudice because of race, creed, color, religion, *age,* national origin, sexual preference, local or remote residence, or economic status for or against either party." (Emphasis added.) See Suggested Pattern Jury Instructions (Criminal) § 1.70.11 (4th ed. 2007, updated July 2021).[3] Although Hill objected to this addition at the charge conference, he did not make any objection after the jury was charged. Consequently, this enumeration is reviewable for plain

---

[3] The entirety of that pattern jury instruction, entitled "Sympathy," is as follows:

> Your verdict should be a true verdict based upon your opinion of the evidence according to the laws given you in this charge. You are not to show favor or sympathy to one party or the other. It is your duty to consider the facts objectively without favor, affection, or sympathy to either party.
> In deciding this case, you should not be influenced by sympathy or prejudice (because of race, creed, color, religion, national origin, sexual preference, local or remote residence, economic (or corporate) status) for or against either party.

The trial court charged the first three sentences without change.

error only. See *Jivens v. State*, 317 Ga. 859, 861 (2023) ("An objection voiced at the charge conference does not preserve for ordinary appellate review a party's objection to the charge as subsequently given."). We see no plain error.

To show plain error, Hill "must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Clark v. State*, 321 Ga. 732, 734 (2025) (citation and quotation marks omitted). "To constitute plain error, an error in a jury instruction must have been obvious, among other things." Id. "For an error to be obvious for purposes of plain error review, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule." *Sconyers v. State*, 318 Ga. 855, 859 (2024) (citation and quotation marks omitted).

Hill argues that altering the pattern instruction to include "age" unfairly limited the defense, unnecessarily confused the jury,

20

and restricted its open and untrammeled consideration of the case when Hill did not improperly inject his age into the case or argue that it was a factor for the jury's consideration. See *Jackson v. State*, 311 Ga. 626, 633 (2021). But Hill points to no precedent holding that it is error to instruct the jury not to be influenced by sympathy or prejudice because of age. Indeed, the only case Hill cites in support of his argument mentioned neither the pattern charge nor age; stated that "[t]he decision over whether to give a cautionary charge to the jurors, informing them that they should not be influenced by sympathy or prejudice in reaching a verdict, is a matter generally addressed to the sound discretion of the trial judge"; and held that the trial court did not "abuse[ ] its discretion in declining to give the cautionary charge Appellant requested." Id. See also *Clark*, 321 Ga. at 734-35 (holding that the appellant's claim of error in a jury instruction about the grand jury process "fail[ed] at the second step of plain-error review" where the appellant pointed to "no precedent holding that it was error to instruct the trial jury about the grand jury process or detailing the level of specificity necessary for such an

21

instruction"). Accordingly, it was not obvious beyond reasonable dispute that the trial court erred in its instruction on sympathy, and, therefore, Hill has failed to show plain error.

3. Hill contends that the trial court abused its discretion when it admitted into evidence a post-incision photograph from the autopsy of McKinney. In the photograph, McKinney's scalp had been peeled away to reveal a splitting or separation of his skull. Hill argues that the photograph was gruesome, unnecessary, and irrelevant to any issue because there was no dispute that Dickey killed McKinney with a shotgun fired at the back of his head. According to Hill, because neither the manner nor cause of death was in dispute, the sole purpose of the photograph was to inflame the passions of the jury. We conclude that the trial court did not abuse its discretion in admitting the single post-incision autopsy photograph.

"In general, the admissibility of autopsy photographs is governed by OCGA §§ 24-4-401, 24-4-402, and 24-4-403." *Johns v. State*, ___ Ga. ___, ___ (2025), S25A0875, slip op. at 11 (Ga. Aug. 12,

22

2025). An autopsy photograph is relevant evidence if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," OCGA § 24-4-401, and a relevant autopsy photograph is generally admissible as evidence, see OCGA § 24-4-402. However, such a photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. "In reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Salvesen v. State*, 317 Ga. 314, 317 (2023) (citation and quotation marks omitted). "Decisions regarding relevance are committed to the sound discretion of the trial court, and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Albury v. State*, 314 Ga. 459, 461 (2022)

(citation and quotation marks omitted).

"Autopsy photographs may be relevant and probative to show the nature and location of a victim's injuries, even if the cause of death is not disputed." Id. (citation and quotation marks omitted). "The State bore the burden to prove all of the elements of all of the crimes charged." *Moore v. State*, 307 Ga. 290, 295 (2019). "[T]he State was not required to stipulate to the cause of death and the circumstances surrounding the murder …. Indeed, a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it." *Salveson*, 317 Ga. at 317 (citation and punctuation omitted).

In this case, the medical examiner explained that the photograph at issue showed a fracture along the midline of McKinney's skull and that the energy coming into the back of his head from the shotgun pellets caused the skull to break apart. Thus, the photograph was relevant to show the nature and location of McKinney's injuries, which "corroborated the State's evidence of the circumstances of the killing." *Moore*, 307 Ga. at 295 (citation and

quotation marks omitted). See also *Albury*, 314 Ga. at 461. Moreover, the probative value of the photograph was high, and the danger of unfair prejudice from its admission was low, given that it was unlikely that the jury found Hill guilty solely because of the gruesomeness of this single autopsy photograph. See *Salvesen*, 317 Ga. at 317 ("[T]he mere fact that the photographs were gruesome does not, as a general matter, render them inadmissible under Rule 403."). Given the medical examiner's testimony, the trial court did not abuse its discretion by admitting into evidence the autopsy photograph at issue here. See *Flowers v. State*, 307 Ga. 618, 624 (2020) (holding that the trial court did not abuse its discretion in admitting an autopsy photograph that showed "the underside of [the appellant's] brain, to illustrate the extent of the bruising," and was relevant evidence of the severity of that immediately lethal injury).

*Judgment affirmed. All the Justices concur.*